STATE EX REL. THOMSON, Attorney General, Petitioner, vs. GIESSEL, Director of Department of Budget and Accounts, Respondent.

*September 16—October 11, 1955.*

18

22

For the petitioner there was a brief by the *Attorney General* and *Warren H. Resh,* assistant attorney general, and oral argument by *Mr. Resh.*

For the respondent there was a brief by *Louis Quarles,* special counsel, and *Charles S. Quarles* and *William K. Mc-Kibbage,* all of Milwaukee, and oral argument by *Mr. Louis Quarles, Mr. Charles S. Quarles,* and *Mr. McKibbage.*

A brief was filed by *Fairchild, Foley & Sammond, Leon F. Foley, Lynford Lardner, Jr., Allen M. Taylor,* and *Harry L. Wallace,* all of Milwaukee, as *amici curiae.*

STEINLE, J. By the demurrer the respondent challenges the constitutionality of ch. 144, Laws of 1955, and the validity of the action taken or proposed thereunder by the state agencies as asserted in the complaint. The act amended sec. 20.41 (5) ; repealed and re-created secs. 20.07 (9m), 20.38 (8) and (12) (a), 36.06 (6), and 37.02 (3), Stats. It created sec. 14.89. The purpose of the act is to provide means whereby the state building commission, University Board of Regents, and the Board of Regents of the State Colleges may construct and finance buildings for use of the state. The principal parts of the enactment as applicable to the state building commission and to the respective Boards of Regents in substance are as follows:.

a. Each agency has the power either to sell any land which it owns, including the buildings thereon, to a nonprofit sharing corporation, or

b. It has the power to lease land and buildings to a nonprofit sharing corporation for terms not to exceed fifty (50) years.

c. It has the power to lease or sublease back from nonprofit sharing corporations, land conveyed or leased as stated above, and such lease may be subject or subordinated to one or more mortgages.

d. All plans, leases, and conveyances must be submitted to the state engineer and the governor for approval.

e. All revenues derived from the operation of any buildings thereon or constructed thereon must be devoted to the payment of the rentals due.

f. The corporations each have the power to pledge and assign all revenues from said buildings and security for the payment of any rentals due or to become due.

g. It has the power to agree on any lease or sublease, to impose fees, rentals, or other charges in an amount sufficient to pay the rentals due or to become due upon the buildings.

h. It has the power to apply all or any of the rental derived from the operation of existing buildings to the payment of any rentals due or to become due.

i. It has the power to pledge and assign all or any of the revenues derived to the payment of rentals due or to become due under any lease or sublease.

j. It has the power and the duty upon the receipt of notice to pay the rentals or any payments due or to become due to any assignee.

The act further provides that the state shall be liable for any defaults under any lease or sublease, and that it may be sued, therefore, on contract pursuant to ch. 285 except that the lessor need not file any claim with the legislature prior to the commencement of the action.

The act also amends certain provisions of ch. 20, Wis. Stats., which provisions relate to the fees and other revenues derived from the operation of the university. Primarily, the amendments provide that any moneys received under conveyance as outlined above shall be paid into the general fund and are applied, therefore, for the payment of rentals and other expenditures provided for under the lease.

The respondent challenges the validity of the act and of the action of the state agencies thereunder on the ground that the same contravene one or more of the following constitutional provisions:

"Article VIII. FINANCE. . . .

*"Contracting state debts.* Section 4. The state shall never contract any public debt except in the cases and manner herein provided. . . .

*"Public debt for extraordinary expense; taxation.* Section 6. For the purpose of defraying extraordinary expenditures the state may contract public debts (but such debts shall never in the aggregate exceed one hundred thousand dollars).

Every such debt shall be authorized by law, for some purpose or purposes to be distinctly specified therein; and the vote of a majority of all the members elected to each house, to be taken by yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt and the principal within five years from the passage of such law, and shall specially appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed, nor the taxes be postponed or diminished, until the principal and interest of such debt shall have been wholly paid.

*"Public debt for public defense.* Section 7. The legislature may also borrow money to repel invasion, suppress insurrection, or defend the state in time of war; but the money thus raised shall be applied exclusively to the object for which the loan was authorized, or to the repayment of the debt thereby created.

*"Credit of state.* Section 3. The credit of the state shall never be given, or loaned, in aid of any individual, association, or corporation.

*"Internal improvements.* Section 10. The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; but whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion. Provided, that the state may appropriate money in the treasury or to be thereafter raised by taxation for the construction or improvement of public highways or the development, improvement, and construction of airports or other aeronautical projects or the acquisition, improvement, or construction of veterans' housing. Provided, that the state may appropriate moneys for the purpose of acquiring, preserving, and developing the forests of the state; but there shall not be appropriated under the authority of this section in any one year an amount to exceed two tenths of one mill of the taxable property of the state as determined by the last-preceding state assessment."

"Article XI.   Corporations. . . .
"*Acquisition of lands by state and cities; sale of excess.*
Section 3a.   The state or any of its cities may acquire by gift, purchase, or condemnation lands for establishing, laying out, widening, enlarging, extending, and maintaining memorial grounds, streets, squares, parkways, boulevards, parks, playgrounds, sites for public buildings, and reservations in and about and along and leading to any or all of the same; and after the establishment, layout, and completion of such improvements, may convey any such real estate thus acquired and not necessary for such improvements, with reservations concerning the future use and occupation of such real estate, so as to protect such public works and improvements, and their environs, and to preserve the view, appearance, light, air, and usefulness of such public works."

With reference to the first and second causes of action alleged in the complaint, the respondent specifically contends that: (a) The regents by consenting to an assignment or pledge by the Wisconsin University Building Corporation of the regents' obligation to pay rentals, and by making an investment in the equity of the properties, loaned the credit of the state contrary to sec. 3, art. VIII of the state constitution, and (b) that the transactions in their entirety, although in form leases and re-leases, were actually contracts of purchase, and thereby created state debts contrary to secs. 4, 6, and 7, art. VIII of the state constitution.

With reference to the first cause of action it is further contended that sec. 36.06 (6) (b), pars. 8 and 9, Stats., by authorizing the regents to agree to pay rentals for the indoor-practice building out of income derived from the operation of existing buildings, thereby permits the creation of a state debt contrary to secs. 4, 6, and 7, art. VIII of the state constitution.

With reference to the second cause of action it is further maintained that the building of a dormitory for students on property not located on or adjacent to the university campus

is a work of internal improvement within the purview of sec. 10, art. VIII of the state constitution, and is prohibited thereby.

With reference to the third cause of action it is contended (a) that the property is state land even though the Wisconsin State Public Building Corporation holds legal title, and that a debt is created in violation of secs. 4, 6, and 7, art. VIII of the state constitution; (b) that the state cannot convey real property which is necessary for the construction or improvements, *i. e.*, public buildings, without violating sec. 3a, art. XI of the state constitution; (c) that the state building commission by consenting to a pledge by the building corporation of the commission's obligation to pay rentals, loaned the credit of the state contrary to sec. 3, art. VIII of the state constitution; and (d) that the entire transaction, although in form a sale of land and lease back, was actually a contract of purchase for the building and thereby created a state debt contrary to secs. 4, 6, and 7, art. VIII of the state constitution.

We shall first consider whether the state loans its credit in violation of sec. 3, art. VIII, Const., when consenting to the assignment or pledging of the rentals by the respective building corporations to the banks and to the insurance company as to the transactions embraced in all of the causes of action asserted in the complaint; and also with reference to its making of an investment in the equity of the properties in connection with the indoor-athletic-practice building and dormitory projects referred to in the first two causes of action of the complaint.

This court has heretofore ruled that when authorized by the legislature, the state may validly lease property from others for its use when such property is required by it in the performance of its governmental functions, and that the payment of future rent is not a presently existing debt of the state within the meaning of the term "indebtedness" referred

to in the state's constitutional provisions. These principles were clearly enunciated in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 346, 65 N. W. (2d) 529. There is no challenge by respondent of the rule that an obligation of the state to pay periodic rentals contingent upon corresponding enjoyment of the property, is not state debt, and that since it is not such debt, the credit of the state is not loaned thereby.

Sec. 3, art. VIII, Const., provides:

"The credit of the state shall never be given, or loaned, in aid of any individual, association, or corporation."

This provision was analyzed and construed in *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 197, 277 N. W. 278, 280 N. W. 698. It was there held that:

"It is our conclusion that the giving or loaning of the credit of the state which it was intended to prohibit by sec. 3, art. VIII, Wis. Const., occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party. There is no such giving or loaning of the state's credit within the meaning of that prohibitory provision when all that is done by the state is to incur liability directly or only to such other party as, for example, where the state lawfully employs someone to perform an authorized service for the state."

Manifestly, the only purpose of this provision is to prohibit the state from acting as a surety or guarantor of the collateral obligation of another party. It is the promise by the state as a guarantor to answer for the debt of another that is proscribed by the state constitution. In *State ex rel. American Legion 1941 Convention Corp. v. Smith* (1940), 235 Wis. 443, 293 N. W. 161, it was determined that the legislature had guaranteed the convention corporation's debts as to the

national association, and that, consequently, such action was within the prohibition of sec. 3, art. VIII, Const.

Respondent concedes that under arrangements as here, state indebtedness would not exist without the assignment and pledging of the leases. He maintains, however, that the assignment of the state's rental obligation converts the obligation into indebtedness. Under the contracts in question, the results of the assignment and pledging are not to require the state to pay the obligations of the building corporations, but merely to require it to pay its rental obligations to the lenders rather than to the building corporations. The state neither undertakes to pay nor does it become legally bound to pay any debts of the building corporations incurred by them for adding improvements to the properties involved, or for any other purpose. There is here no promise of a guarantor to answer for the payment of a debt of another. A lessor has a traditional right to assign rents. Legally, the state is in no different position by agreeing to pay rent and actually paying it to the assignee or pledgee than it would be in having agreed to pay and in paying the rent to the lessor. Under provisions of the lease the rent is payable in instalments as the property is used by the state. No new legal obligations are assumed by the state's consent to the assignment. The situation is comparable to that in *Connor v. Marshfield* (1906), 128 Wis. 280, 107 N. W. 639, where it was held that rentals payable to a third person did not constitute indebtedness until each instalment was due.

Since the state is permitted by law to rent the properties in question, and since the future rental payments for the use of such properties do not create existing indebtedness, the state's consent to pay the rent to persons designated by the lessors, in nowise transforms its obligation of paying accruing rents into a form of indebtedness that is a "legally enforceable obligation" and which in a constitutional sense would give rise to lending the credit of the state. We are constrained

to determine that the assignment and pledging of the state's rental obligation did not create a state debt, and that by consenting to such arrangement the state did not loan its credit, contrary to the constitutional provision in question.

Respondent argues that by having made an investment in the leased property, the state is irrevocably bound to see the project through, and lend its financial aid and credit toward the completion thereof, no matter what obstacles arise in the future. He points out that in the practice-building enterprise the sum of $900,000 will be supplied directly by the regents, which amount furnishes an equity behind the sum of $600,000 that will be borrowed by the Wisconsin University Building Corporation from the banks; and that in the dormitory project $184,000 will be furnished through funds made available by the state building commission which is a substantial equity behind the $125,000 to be borrowed by the building corporation from the insurance company. The fact that the state has invested or will invest such amounts, in nowise obligates it to pay all or any portion of the sums that are borrowed by the building corporations for use by those corporations in the performance of their part of the undertakings.

Respondent argues further that since the banks are willing to loan the money with no security other than the chose in action for its recovery, and that since neither the building corporation nor the banks have any right to re-enter or retake possession of the premises in the event of nonpayment of rent or of other defaults by the regents under the subleases referred to in the first two causes of action, it is plain that the credit of the state is the compelling force, and that such credit is being relied upon exclusively by the lenders, and that as a consequence the state loans its credit in favor of the banks and the insurance company.

Similar argument was raised and rejected in *State ex rel. Wisconsin Development Authority v. Dammann* (1938),

228 Wis. 147, 277 N. W. 278, 280 N. W. 698, and in *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. (2d) 873. In the *Wisconsin Development Authority Case* it was said (p. 196):

"It is argued that the giving or loaning of credit does not necessarily mean the creation of an indebtedness, but includes the holding out of an expectation that payment will be forthcoming and belief or faith that the state will make the disbursement."

However, the court concluded (p. 197):

"There is no such giving or loaning of the state's credit within the meaning of that prohibitory provision when all that is done by the state is to incur liability directly or only to such other party as, for example, where the state lawfully employs someone to perform an authorized service for the state."

In the other case, *State ex rel. Thomson v. Giessel, supra,* the court declared (265 Wis. at p. 199):

"Respondent argues that the bond-buying public will feel that the state is giving its credit to the turnpike-corporation bonds even though there is no legal obligation on the part of the state, because it will be reasoned that the state could not afford to allow the project to fail. Obviously, this cannot be the test to be applied. The test of a 'legally enforceable obligation' laid down in the *Wisconsin Development Authority Case, supra,* is the only sound one."

For the reason that there is no enforceable legal obligation on the part of the state to pay the obligations of the building corporations even though good judgment may dictate that it do so voluntarily, it cannot be held that the state loaned its credit in violation of the constitutional provision.

It is to be noted also that the state is not under a legally enforceable obligation to pay rent in any of the causes of action. Under provision of ch. 144, Laws of 1955, particu-

larly secs. 14.89 (1) (c), 36.06 (6) (b), Stats., it is express-
ly provided that the obligation of the state to pay rent to a
building corporation shall be subject to available appropria-
tions. Since the availability of appropriations is within the
sole control of the state, this condition renders the state's
rental obligation entirely optional and within its discretion.
No legally enforceable obligation results.

Specifically with reference to the pledging of the rentals
of the state-office-building addition by the Wisconsin State
Public Building Corporation to the insurance company, re-
spondent contends that the consent by the state (state build-
ing commission) as lessee to such pledging produces an
indebtedness which is legally enforceable in the constitutional
sense, and also that the agreement to charge rentals at rates
sufficient to pay all costs, charges, expenses, and rent payable
by it under the lease, is a legally enforceable obligation and
constitutes a lending of the state's credit in favor of the in-
surance company. The pledging of the rentals under the
mortgage instrument to the insurance company is no different
in principle than the assignment and pledging of the rentals
with respect to the indoor-practice-building project and the
dormitory enterprise hereinbefore discussed.

The state may obligate itself to impose charges sufficient
to meet rental obligation without creating state debt. A
promise by the state to maintain rates or impose charges
sufficient to produce revenues large enough to make specified
payments does not constitute state debt. The creditors' reme-
dy is limited to coercing the state officials to carry out their
duties under the agreement. Neither the general revenues
nor any of the property of the state become subjected to the
creditors' claim. In *Morris v. Ellis* (1936), 221 Wis. 307,
312, 266 N. W. 921, this court affirmed a judgment that:

". . . it was the duty of the village of Eagle River and
the Eagle River light and water commission promptly to ap-
ply to the public service commission for an increase in rates,

and take all other steps reasonably calculated to increase its revenues and decrease its operating expenses to the end that the utility might be able to meet all lawful charges and expenses, including principal and interest on the mortgage certificates as the same fall due."

We are obliged to conclude that there is no loaning of the state's credit with reference to these particular arrangements.

Respondent argues that since the addition to the state office building can be occupied only by state agencies designated by the commission, it follows, that the money loaned for construction of the project necessarily will be paid back by the state in the form of so-called rental payments. We fail to perceive how rentals chargeable to departments or groups of the state vary in kind from rentals contracted for by the state and due from it to others. It is clear that such rentals are not indebtedness within the prohibition of the constitutional provision in question.

We come now to a consideration of respondent's contention that the respective transactions in their entireties, although in form leases and re-leases (as to the indoor-practice building and dormitory projects) and sale of land and lease back (as to the state-office-building addition), actually are contracts of purchase and create state debt contrary to secs. 4, 6, and 7, art. VIII, Const.

Respondent submits that the obvious purpose of each of the leases by the building corporations to the state agencies is to insure that the rental payments are at all times sufficient to liquidate the entire debts of the building corporations as the same become due. He argues that in the light of such purpose it is clear that each contract, although denominated a lease, is not such in fact, but actually constitutes an instalment-payment purchase of the building to be constructed, and that hence the state is indebted for the total of all rentals to be paid to the building corporation during the entire term of the lease in violation of secs. 4, 6, and 7, art. VIII, Const.

Respondent maintains that the so-called "rental payments" actually constitute the complete consideration paid by the state for its ultimate acquisition of the property.

In support of his position respondent relies upon principles expounded in Anno. 71 A. L. R. 1318, as to when a lease will be treated as a lease, and when it will be treated as a contract of purchase. Respondent directs attention to the majority rule as stated in 71 A. L. R. 1326, that:

"Where the lease is, in fact, intended as a lease, and the rentals are in fact such, rather than payments on the purchase price, the courts, without exception, hold that such a lease of property by a city, county, school district, or other political subdivision, with an option to purchase the same at a fixed price in addition to the rentals, does not create an indebtedness or liability within the meaning of a constitutional or statutory limitation of indebtedness. . . .

"And some of the cases reach this conclusion, even where the rentals paid are to be applied or credited on the amount of the purchase price, in the event the municipality elects to exercise the option to purchase. . . .

"But a contract which, though denominated and purporting to be a lease with option to purchase, is in fact a contract of purchase by payments in instalments, is treated as a contract of purchase rather than as a lease; and, according to the great weight of authority, the fact that the so-called rentals are sufficient, if paid throughout the term of the lease, to cover the entire purchase price, and to enable the municipality to acquire the property without further payment, renders the contract one of purchase rather than lease, and gives rise to an indebtedness, within the meaning of a constitutional or statutory debt limitation."

It is to be noted that in the paragraph following the quotation cited by the respondent, it is said:

"If it be urged that a *bona fide* lease with option to purchase is a palpable scheme or device to evade the constitutional limitation of indebtedness, it must be answered that, while this arrangement is designed to avoid the effect of such

a constitutional provision, it is intended to do so lawfully, by keeping out of prohibited territory altogether, rather than by attempting to cross this territory in disguise; that this plan is not designed to accomplish indirectly that which could not be done directly, but rather to accomplish legally that which could not be done in an unlawful manner. *For it must be kept in mind that the purpose of a debt limitation is not to prevent the municipality from acquiring buildings or public works, but to place a limitation on the extent to which it may pledge its credit and hence burden the taxpayers.* And if it can acquire such property without becoming indebted therefor or exceeding the constitutional limitation, neither the spirit nor the letter of the provision has been violated. There is, in the typical case, an intention to acquire the leased property, but no obligation to do so." (Italics supplied.)

At Anno. 145 A. L. R. 1362, it is said:

"The recent cases on the point tend to confirm the general principle stated in the original annotation, that the leasing of property by a city, county, or other political subdivision, with an option to purchase the same, does not give rise to an indebtedness or liability of the public body for the stipulated optional purchase price or for the aggregate of all the rentals for the entire term, *provided the instrument is in fact a lease,* and not a contract of purchase on the instalment plan." (Italics supplied.)

The complaint indicates that about three fifths of the costs of the indoor-practice building and two thirds of the cost of the dormitories will be contributed by the state. It cannot be said that the rentals as fixed in the present leases for those facilities are upon the entire construction cost of the buildings. Here, there are no purchase options. The payments are at the state's option.

When the leases from the regents to the building corporation and from the building corporation to the regents expire, both parties will again be situated in the same status as they were at the inception of the leases. The title to the real estate,

including the buildings, will at all times have been in the regents. There is no passing of title under the transactions. As to the state-office-building unit, the state will own neither the land nor the building when its lease expires. The title will remain in the building corporation. That corporation, as was determined in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529, is not an agency or instrumentality of the state, but a private corporation organized for a public purpose. Clearly it may hold property in its own name. Respondent points out that upon dissolution of the corporation, the assets are transferred and vested in the state, and that hence it is not difficult for the state to acquire the legal title to the land and building in question whenever it desires to do so. We are obliged to determine that the state does not own the property of the corporation any more than do stockholders own the property of their corporations. However, were it to be held otherwise, then it is clear that the state could not contract to purchase property already owned by it.

There cannot be a purchase without the passing of title. There is no passing of title in any of these transactions.

With reference to the indoor-practice building and dormitory projects, the leases provide that the obligation to pay rent is subject to available appropriations by the legislature. Since there is no binding obligation on the part of the state to pay rent for the full terms of the leases, it is inconceivable that a debt is incurred or that a purchase of the property is contemplated.

Respondent submits that the facts relating to the present transactions in essence compare with those in *Earles v. Wells* (1896), 94 Wis. 285, 68 N. W. 964, and that the results here ought to be the same as they were in that case. However, it appears that the facts are distinguishable. In that case a contract with the city of Kaukauna for the construction of waterworks provided that the constructor, a private

company, might issue bonds to a certain amount on the plant. It was agreed that when the works were completed, the constructors would lease them to the city in consideration of certain yearly rentals. The constructors were privileged to assign the lease to mortgagees and trustees for the benefit of bondholders. The city was to take possession and assume the management and operation of the works. The city was also to pay the taxes and assessment, keep the plant in repair, and to pay all damages arising from maintenance and operation. Rentals in excess of interest on the bonds were to be at once applied to the cancellation for payment thereof. Upon payment of all the rentals the plant was at once to pass and become the property of the city without further conveyance or contract. The court held that the arrangement was an indirect method of expressly agreeing to pay the principal and interest to become due on the bonds, and that the city's obligation was a debt. It was determined that since a debt in excess of the constitutional limitation resulted, the contract was void.

True, in *Earles v. Wells, supra,* the contract had been denominated a lease but was held to be a contract of purchase. The similarity of the amount of the rentals and the amount of the debt incurred for constructing the works was not a factor in the court's determination of the cause. The court found that the city was legally bound for all of the payments which were to be made over the twenty-year term, and that title to the property would pass to the city when the payments were made. At page 295 in *Earles v. Wells,* the court said:

"In fact, by the express provisions of the ordinance and contents of each bond, as therein prescribed, the city is, in legal effect, to be a party to each and every bond, and necessarily responsible for its payment."

In the present transaction there exists no obligation on the part of the state to pay the expenses of construction in-

curred by the building corporations. Title to the property does not pass by virtue of the payment of the rentals.

Also, to sustain his position that the entire transaction relating to the state-office-building addition creates a debt on the part of the state in contravention of secs. 4, 6, and 7, art. VIII, Const., the respondent relies on *McCutcheon v. State Building Authority* (1953), 13 N. J. 46, 97 Atl. (2d) 663, wherein it was said (13 N. J. 62, 65, 97 Atl. (2d) 671, 672):

"There is, for the reasons stated, a radical difference in the relationship between the state and the Authority and the state and a private corporate lessor, *e.g.,* Prentice Realty Co., under the lease referred to supra. The Authority is not an independent autonomous public corporation. It may lease its building facilities only to the state, its departments, agencies, and instrumentalities. As we have seen, the motor vehicle inspection stations and the state police barracks are required to be erected on sites selected by the respective departmental heads and approved by the attorney general and the State House Commission, and the housing facilities, on sites chosen by the Commissioner of Institutions and Agencies and approved by the State Board of Control of Institutions and Agencies and the State House Commission. And, quite apart from other considerations heretofore adverted to, the state's taxing power is the sole source of its revenue. . . . Here, we have 'the attributes of a purchase;' such is the very essence of the plan. It is immaterial in this regard that title remains in the Authority; the corporate entity holds the property for the state. Such a distinction under the circumstances here would be wholly artificial and illusory."

That case is distinguishable from the present situation in that it rests on legal premises which this court has not adopted. The decision indicates that the New Jersey constitutional prohibition not only applies to "debt or debts," but also to the broader term "liability or liabilities." Manifestly, it was for such reason that the New Jersey court held that the prohibition applied even where the state is not under a legally enforceable obligation. This court, however, has heretofore

held that no state debt is created unless the state itself is under a legally enforceable obligation. *State ex rel. Wisconsin Development Authority v. Dammann, supra,* and *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. (2d) 873.

Further, the New Jersey statute provided that contracts made under the act were binding upon the state "notwithstanding that no appropriation was made or provided to cover the cost or estimated cost of the contract." However, the statute in the instant situation, to wit, ch. 144, Laws of 1955, sec. 14.89 (1) (c), Stats., provides that the state's obligation to pay rentals shall be "subject to available appropriations."

There is further distinction in that it appears that under the New Jersey statute the State Building Authority could lease only to the state, and that state tax money was the sole source of its revenue. The court refused to recognize the separate identity of the Building Authority, observing that "the property of the Authority becomes the property of the state." The Wisconsin State Public Building Corporation, however, possesses the broad power "to buy, lease, and otherwise acquire and to sell and convey real estate." In *State ex rel. Wisconsin University Bldg. Corp. v. Bareis* (1950), 257 Wis. 497, 44 N. W. (2d) 259, this court observed that the building corporation had leased land to and was receiving rentals from private tenants who had no connection with the university. Being a private corporation and not an agency of the state, the Wisconsin State Public Building Corporation is not inhibited from engaging in the leasing of land to or from private parties.

An instalment-purchase agreement does not necessarily create state debt. It has been determined in this state that no state debt is created where payments are to be made solely at the state's option. In *Burnham v. Milwaukee* (1897), 98 Wis. 128, 73 N. W. 1018, the action was commenced by a taxpayer to restrain the city from issuing

certain bonds, claiming that the city's constitutional debt limitation was exceeded by the obligation involved. The primary question was whether certain contracts for the purchase of parks fell within the constitutional debt limitation. There had been no attempt to designate the payments to be made by the city as "rent." The contract provided that after a certain number of instalment payments had been made, the parks would become the property of the city. However, there was no obligation on the part of the city for all the instalment payments, and it could refuse to pay more money at any time without liability for the balance of the instalments. The court determined that no debt was created by such undertaking and, at page 132, it observed that:

"There is no doubt of the meaning of the word 'debt' as used in the law. It means 'something owed;' 'money due or to become due upon express or implied agreement.' 1 Bouv. Law Dict. tit. 'Debt.' It denotes, not only an obligation of the debtor to pay, but the right of the creditor to receive and enforce payment. *Board of Comm'rs of Monroe Co. v. Harrell* (Ind. Sup.), 46 N. E. Rep. 124. Under the constitution as well as under the law of taxation, the question is, Is the city indebted? Is it under obligation to pay to some one the balance of the purchase price of these lands? It will not do to say that it will probably make the payments, or that it would be foolish not to do so, but we must be able to say that it has contracted, either expressly or impliedly, to do so. This is precisely the same question which arose in the other cases above referred to, and in which we decided that there was no debt or legal obligation, and it would seem like juggling with plain words to say now that there is a debt or legal obligation."

Similarly in the present matters, because the payments under the respective leases may be made at the option of the state, no debt is created. Were it to be held that the payments in the instant contracts constituted purchase instalments in-

stead of rentals, no debt would be created for the reason that the payments may be made at the option of the state.

The contracts here bear every characteristic of leases. Notwithstanding that the rentals payable by the lessees are equal to the obligations incurred by the lessors, it cannot be said that as a consequence they become changed in species and must be regarded as purchase-contract instalments. The measure of rental payments does not convert a lease to a purchase contract. It does not follow that merely for the reason that rent equals debt service, it is not rent, but constitutes instalment on a purchase contract.

There is intimation that the plan is a subterfuge to evade the constitutional provisions. In *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 564, 61 N. W. (2d) 903, it was said:

"It is elementary that if the statute appears on its face to be constitutional and valid, we may not inquire into the motives of the legislature, and that all doubts as to its constitutionality must be resolved in favor of its validity.

" 'It is of no legal consequence to say that the plan is a subterfuge and devised for the mere purpose of circumventing the constitution. That may be admitted without answering the question thus presented one way or the other.' *Loomis v. Callahan*, 196 Wis. 518, 524, 220 N. W. 816. . . .

"Our search must be for a means of sustaining the act, not for reasons which might require its condemnation."

There is nothing in the enactment or in the transactions thereunder that gives indication of either an unlawful purpose or the use of an illegal method. We concur in the observation of the court as expressed in *Tranter v. Allegheny County Authority* (1934), 316 Pa. 65, 84, 173 Atl. 289, 297, that:

"It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it."

It is not suggested that the amounts of the rentals in the respective leases are unfair or unreasonable, nor do they appear to be so.

We are obliged to conclude that the contracts in question are true leases and not instalment-purchase contracts, and that no debt is created by the transactions in contravention of secs. 4, 6, and 7, art. VIII, Const.

Our next consideration treats with the contention of the respondent that since sec. 36.06 (6) (b) 8 and 9, Stats., authorizes the regents to agree to pay rentals for the indoor-practice building out of income derived from the operation of existing buildings, a debt is created.

Under sec. 20.41 (5), Stats. (ch. 144, Laws of 1955), receipts from student facilities, athletic operations, and the Memorial Union are paid into the general fund of the state, and thereafter the moneys are reappropriated as a revolving appropriation to the regents for purposes including such as the payment of rental under the sublease here. Respondent argues that although the rentals are paid from the general fund, actually they are derived in part from the operation of existing buildings. He maintains that the payment of rentals under this arrangement is in contravention of the constitution, since a debt is created thereby.

The relator submits that once the money is paid into the state treasury it becomes state money and can be paid out by the state treasurer only in pursuance of an appropriation by law (as provided in sec. 2, art. VIII, Const.). He contends that merely because it is handled on a revolving basis does not change its character or give rise to any special or trust fund. We consider that the relator's position in this regard is correct. As already determined herein, the lease does not create a debt. The obligation of the regents to pay rent for the periodic use of the property is subject to appropriations that are available for the purpose. The right of re-entry of the lessor has been specifically waived, and there can be no pos-

sibility of any loss of the property in the event of the shortage of funds to pay rent. We perceive of no substantial distinction in the legislature's appropriation as made here in comparison with a straight appropriation of a specified sum, the latter which would clearly be valid. In circumstances as here there is no proscription of the payment of rentals from income-existing facilities. The nature of the fund from which the rentals are paid does not alter the nonenforceable and contingent character of the obligation.

The state in no manner has pledged its income for the payment of the rentals, nor has it assigned the same. The rentals are not an enforceable charge upon the fund from which they are provided. There can be no foreclosure and consequent loss of state-owned property as in *State ex rel. Morgan v. Portage* (1921), 174 Wis. 588, 184 N. W. 376, and *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529.

We find no merit to respondent's challenge with reference to this item.

We next consider respondent's contention that the construction by the regents of noncampus dormitories is a work of internal improvement and contravenes sec. 10, art. VIII, Const.

Any structure which is used by the state university for the purpose of education is excluded from being a work of internal improvement. *State ex rel. Owen v. Donald* (1915), 160 Wis. 21, 79, 151 N. W. 331; *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529.

Respondent submits that in attempting to build modest rental dormitories for university students, the regents are stepping outside their proper function of education and entering into competition with private enterprise, and thereby conduct a work of internal improvement. With reference to this position respondent relies principally upon the principles declared in *State ex rel. Jones v. Froehlich* (1902), 115 Wis.

32, 91 N. W. 115, and *State ex rel. Martin v. Giessel* (1948), 252 Wis. 363, 31 N. W. (2d) 626. In the first of these cases, *State ex rel. Jones v. Froehlich,* this court said that works of internal improvement comprise (p. 38):

". . . those things which ordinarily might, in human experience, be expected to be undertaken for profit or benefit to the property interests of private promoters, as distinguished from those other things which primarily and preponderantly merely facilitate the essential functions of government."

In the latter of the cited cases, *State ex rel. Martin v. Giessel,* the court was concerned with public housing for veterans, but not student housing. It was there said (252 Wis. at p. 370):

"It would appear almost axiomatic that if housing is a public venture, it constitutes an internal improvement. If it is not a public improvement, then certainly the government could have no basis for entering into the field, for it must then be private business.

"The courts and legislature of Wisconsin have consistently considered activities of this type to be works of internal improvement."

The specific issue is whether the furnishing of housing for students as contemplated in the lease, is in furtherance of and a part of the university's educational system.

The relator in his brief has presented information in the form of excerpts from writings and addresses of persons of prominence and in authority in the field of education, which indicate that from early times to the present, in England and in this country, dormitories in the university educational system have been and are in a sense classrooms of life, and have always been regarded as an integral part of a university. We deem it proper to consider such information, since in determining the constitutionality of a statute, the court may inform itself by resort to encyclopedias, authoritative works

on the subject, reports of committees, scientific bodies, or any other source of information generally considered accurate and reliable. *Ritholz v. Johnson* (1944), 244 Wis. 494, 12 N. W. (2d) 738.

The prevailing purpose and use of dormitories at the University of Wisconsin is summarized in one of the works presented by the relator, to wit, "Report on New Housing" prepared for the regent meeting of January 8, 1955. In part it reads:

"At the University of Wisconsin the division of residence halls is conceived as a part of the university's educational system; its purpose is to provide, in addition to good living accommodations and good food service, a well-rounded, educational, cultural, and social program. Fundamental to this plan are the individual house unit, the House Fellow system, and student self-government. For reasons of economy in operation and construction rather large hall groups have been built. However these halls are broken down into small units or houses which encourage a group spirit and permit development of organizations that afford maximum opportunities to the individual student.

"Each house or unit has assigned to it a house fellow, a young graduate student who is a proved leader by reason of character, intelligence, and personality. House fellows are carefully selected by the residence halls faculty committee. In the men's halls (Tripp, Adams, Kronshage—total occupancy 1,438), there are 24 houses averaging 60 men each; each house has a house fellow. One head fellow co-ordinates the work of these fellows. The women's halls (Elizabeth Waters, Slichter, Barnard, Badger Club, Chadbourne—total occupancy 1,050) have 18 house fellows for a ratio of 1 to every 58 residents. Each of the women's halls has a full-time head resident who is responsible for the direction of the social and educational program in the hall. The broad responsibilities of the house fellows and head residents are to assist the individual student in adjusting to university life, to emphasize and stimulate scholastic achievement, and to assist each resident in gaining the richest possible experiences

from his or her university career. In addition many faculty members contribute generously of their time to meet and talk with groups of residents.

"An indication of the emphasis on scholarship in the halls is borne out by comparison of grades with other students. . . . Hall residents have repeatedly averaged higher grades than other students.

"The Men's Halls Association and the comparable student organizations in the women's halls are the main vehicles which carry out the social and educational program of the halls. Given the responsibility of largely governing themselves with the advice and counsel of the house fellows, head residents, and other staff members, the students gain valuable experience in citizenship and government. The experience they gain in dealing with each other and in managing their own enterprises is invaluable. The Men's Halls Association sponsors 25 different activities including a library, chorus, workshop, camera club, store, and varied athletics. Committees such as finance, public relations, education and scholarship, judicial, social, student conduct are responsible for various phases of student self-government in the halls. The women's halls organizations sponsor a similar slate of activities and opportunities geared to their own needs; they also assist in service projects in local hospitals and rest homes.

"Faculty committees, of which the dean of men and the dean of women are chairmen, serve in an advisory capacity to the director of residence halls in matters of the educational program in the halls. These committees have an important responsibility to fill in co-ordinating the program of the halls with the aims and policies of the university."

Another of the works presented is "Trends in Student Personnel Work" by E. G. Williamson (University of Minnesota Press, 1949, pp. 252, 259) where it is said:

"The first colleges in America provided housing as part of their programs. This was natural, for these colleges were modeled to a great extent after the English universities, Cambridge and Oxford. The influence of these older American colleges has been felt by succeeding institutions of higher learning.

"Today, in America, we find university owned and operated housing programs have evolved along two broad lines. One plan provides students a place to eat and sleep, a place that is proctored so that order is maintained and unruly conduct held at a minimum. The other plan provides, in addition to a satisfactory physical layout, a well-rounded educational, social, and cultural program. *At the University of Wisconsin we are definitely committed to the latter plan. Our division of residence halls from top to bottom is organized to stress the educational opportunities of group living.*" (Emphasis supplied.)

Cited to our attention also is the case of *State v. Board of Regents* (1949), 167 Kan. 587, 595, 597, 207 Pac. (2d) 373, 379, 380, where it was said:

"It is common knowledge that during the early history of this nation's educational program boarding schools were common in this country. For hundreds of years dormitories and dining halls have been furnished by colleges and have been regarded as devoted to college purposes. In fact, at least in the early years of our history, the words 'dormitory' and 'college' were often used interchangeably. In some of them classroom work was conducted in buildings in which students slept and ate. Dormitories were exempt from taxation on the ground that necessary housing facilities were an integral part of the educational purpose. Their exemption from taxation implied a public benefit. The exemption was not intended as an act of grace on the part of the state. On the contrary the exemption was regarded as a distinct benefit to the state. . . .

"Does a student dormitory constitute an 'internal improvement' within the contemplated meaning of the constitution? We think it does not. The state, as a sovereign corporation, may construct a statehouse, courthouse, penitentiary, or buildings for its penal, eleemosynary, and state educational institutions. These, and others of like character, are public buildings, 'public improvements,' and not, 'internal improvements.'"

From an examination of the various authorities presented, it conclusively appears that the dormitories contemplated in the lease will not only offer to students utilizing such facilities, a place to eat and sleep, but will also afford educational opportunity. We are constrained to hold that the construction of the dormitories referred to in the lease is not a work of internal improvement within the meaning of sec. 10, art. VIII, Const.

Respondent also contends that since the regents may fail to perform their promise to charge rentals for the use of the dormitories at rates sufficient to pay all costs, charges, expenses, and rent due under the contract, or that the rentals may be uncollectible, or that the building corporation might not seek to enforce performance, it is likely that the regents in any such eventuality may (pursuant to sec. 36.06 (6) (b) 8 and 9, Stats., ch. 144, Laws of 1955) make payments from income derived from the operation of existing buildings, and also pledge such income therefor. As heretofore indicated with reference to the indoor-practice building, the nature of the fund from which the rentals are paid does not alter the nonenforceable and contingent character of the obligation. There is no provision in the lease authorizing the pledging of such income. We find no merit to respondent's position in this regard.

We come now to a consideration of the respondent's contention that as to the state-office-building-addition project, the property is state land, even though the building corporation holds legal title; and that by virtue of the transaction a debt is created in violation of secs. 4, 6, and 7, art. VIII, Const.

Respondent concedes that the state may own and hold property, and unless prohibited by some constitutional provision, may dispose and convey the property. He maintains that in the present matter, while the building corporation holds the

title to the real estate in its name, the beneficial owner is the state. As to this position respondent relies on the decision in *State ex rel. Wisconsin University Bldg. Corp. v. Bareis* (1950), 257 Wis. 497, 44 N. W. (2d) 259. He also submits that since the state owns the land, it follows, that in the event of foreclosure of the mortgage or exercise of the right to re-enter, the state would be indebted because it stands to lose the use of "existing state property, or an interest therein" as was determined in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529.

In *State ex rel. Wisconsin University Bldg. Corp. v. Bareis, supra,* the court was treating with a question of tax exemption. Such is not the consideration here. In that case the court observed that the reasons for allowing tax exemption to the building corporation were the same as those relating to such exemption to the state. In *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. (2d) 873, the court dealt directly with the proposition that presently owned state lands would be conveyed to a private corporation formed by a state agency, Wisconsin Turnpike Commission, and would be subsequently pledged. The court determined that although the corporation held its property in trust for the state, it was not an agency of the state, and that its obligations were not indebtedness of the state. In that case an arrangement existed whereby after the bonds were paid off, the toll road was to become state property. Here there is no agreement that when the corporation's indebtedness to the insurance company is satisfied, the corporation is to reconvey to the state. Under these decisions it is apparent that since the building corporation is not an agency of the state, its obligations are not enforceable against the state, despite any right to tax exemption.

The primary distinction between the situation in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529, and the present matter is that there an existing

structure owned by the state and in which the private corporation had no interest, was included as security for the mortgage, and that the state's interest in such property was subject to possible loss on foreclosure. However, in the instant matter, since it must be determined under the ruling in *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. (2d) 873, that the obligation of the building corporation is not a debt of the state, there is no possibility of loss to the state.

In *State ex rel. Rogers v. Milligan* (1955), 269 Wis. 565, 568, 69 N. W. (2d) 485, the principle as determined and declared in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. (2d) 529, with reference to the immediate consideration, was reaffirmed.

For the reasons stated, we conclude that no state debt results from the transactions in question.

Finally, respondent contends that the state cannot convey real property which is necessary for the construction of improvements thereon, *i. e.,* public buildings, without violating sec. 3a, art. XI, Const.

Sec. 3a, art. XI, Const., pertains not only to the acquisition of land by the state and by cities for many public purposes including the erection of public buildings, but also provides that "after the establishment, layout, and completion of such improvements" they "may convey any such real estate thus acquired and not necessary for such improvements."

Respondent submits that in so far as the provision expressly authorizes the sale of property, it is a grant of power, but in so far as anything is not specifically enumerated therein, it is a denial of power. He submits further that the language is clear, there is no ambiguity, and that hence there is no room for construction or interpretation. He maintains that the language must be read and understood as it appears on its face. He argues that where the power is granted, it exists; and where it is not granted, it is denied. He contends

that the principle *"Expressio unius est exclusio alterius"* applies. He directs attention to *State ex rel. Owen v. Donald, supra,* where it was said (p. 134) :

"The power to tax is not retained by the people to be exercised by the legislature for all purposes not mentioned. Not by any means. Where the constitution deals with the matter, it deals exclusively. That is the rule. The language, in form, conferring the power to tax for a class of things 'expenses of the state for each year,' though in form in words of grant, is in fact a limitation. *Expressio unius est exclusio alterius.* That rule of construction is peculiarly adaptable to the clear reading of a state constitution, the provisions of which, properly framed, are mere declarations of principles of a general nature and usually in the mandatory or declaratory form.

"If it were not for the light of the well-known rule, many of such provisions, as had been said in the books, would be as meaningless as wastepaper."

Relator, on the other hand, contends that ever since the decison in *Bushnell v. Beloit* (1860), 10 Wis. *195, it has been the well-settled principle in this state that the constitution is to be regarded not as a grant of power, but rather as a limitation upon the power of the legislature, and that it is competent for the state legislature to exercise all legislative power not forbidden by the state or federal constitutions. Cited to our attention is Cooley, Constitutional Limitations (7th ed.), pp. 236, 237, 239:

"The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. . . . Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced, *unless restrictions upon the legislative authority can be pointed out in the constitution,* and the case shown to come within them. . . .

"Nor are the courts at liberty to declare an act void, because in their opinion it is opposed to a *spirit* supposed to pervade the constitution, *but not expressed in words.*" (Emphasis supplied.)

Prior to the adoption of this constitutional provision the state possessed the power to acquire lands for public purposes and to dispose of the same. There is in the provision no express restriction on the power of the state to convey land. It cannot be held by implication that the legislature is precluded from authorizing such sale. A restriction to such effect would necessarily have to be expressed in words. There is no such expression here.

This constitutional provision came into being in the form of an amendment in 1912. It relates not only to the state, but also to cities. Records in the Wisconsin legislative reference library indicate that the purpose of its adoption related to the problem of excess condemnation. In the notes to this section, Wis. Anno. (1930), 112, 113, appears a synopsis of the opinion in *Cincinnati v. Vester* (1930), 281 U. S. 439, 50 Sup. Ct. 360, 74 L. Ed. 950, where it was pointed out that the power given by this section must be so exercised as not to conflict with the Fourteenth amendment to the United States constitution, and where it was held that excess condemnation by a municipality in the absence of definition of use, as required by the statute, must fail.

Clearly there was in the adoption of this provision an attempt to broaden the public purpose for which the power of eminent domain might be exercised. Were it to be considered a restriction, unreasonable results would follow, for then, once the state had acquired the land for the purpose of developing a public building thereon, it could never thereafter ever sell it even though it was frustrated in carrying out its purpose of constructing the building.

We are obliged to determine that the provision is a grant of power which broadened the authority of the state and cities

in the matter of excess condemnation in relation to the rights of the state and cities which had existed in such respects previous to the adoption of the provision. The state's conveyance of the real estate in question to the building corporation does not contravene sec. 3a, art. XI, Const.

*By the Court.*—The demurrer is overruled, and judgment is granted directing the director of budget and accounts to honor, audit, and approve all warrants, vouchers, and requisitions issued to him by the Regents of the University of Wisconsin or the state building commission in the matters herein.