STATE EX REL. EVJUE, Appellant, v. SEYBERTH and others, Respondents.

*January 5—February 2, 1960.*

For the appellant there was a brief by *Willard S. Stafford* and *Rieser, Stafford, Lesselyoung & Rosenbaum* of Madison, and oral argument by *Willard S. Stafford*.

For the respondents State Conservation Commission and Wisconsin Radio Council the cause was argued by *Roy G. Tulane,* assistant attorney general, with whom on the brief was *John W. Reynolds,* attorney general.

For the respondent Wisconsin Valley Television Corporation there was a brief by *Genrich, Terwilliger, Wakeen, Piehler & Conway,* attorneys, and *Paul D. Hilton* and *Lee Nutt* of counsel, all of Wausau, and oral argument by *Herbert L. Terwilliger*.

MARTIN, C. J.  Rib Mountain State Park comprises 550 acres of wooded land located on the top of Rib Mountain in Marathon county close to the city of Wausau. It has been a state park for thirty-seven years and is under the jurisdiction of the Conservation Commission. It was ac-

quired by quitclaim deed from Marathon county in 1922. Also on Rib Mountain and contiguous to the park is a 110-acre tract which was owned, in the spring of 1957, by the Record-Herald Company, a newspaper corporation, which was a stockholder of the TV Corporation.

The top of the mountain is generally considered the highest point of land in the state and as such is uniquely suited for radio and television-transmission purposes. In an area at the summit the Marathon county traffic patrol, sheriff's department, highway department, and Wausau police and fire departments had, for a number of years, a stone building and a 100-foot tower for the operation of a two-way radio system.

An area approximately 1,300 feet long and 600 feet wide near the summit is encircled by a black-top road. This area is used as a camping and picnicking area and is provided with public parking, observation, toilet, and concession facilities.

Since 1949 the Radio Council, with the consent of the Conservation Commission, has maintained within the encircled area a radio tower and antenna 208 feet high. This tower carried broadcasting facilities for state station WHRM, the motor vehicle department, and the forest-protection division of the conservation department. An area 140 feet square in approximately the same location as the Radio Council's facilities was leased to the TV Corporation by the Conservation Commission by an agreement and lease dated August 8, 1957, and ratified October 11, 1957, for the purpose of constructing a transmission building and television tower and antenna.

In the spring of 1957 the TV Corporation, which operates WSAU-TV, considered moving its tower and antennas to the 110-acre tract on Rib Mountain which the Record-Herald Company was willing to sell to it. The plan was discussed with the director of the Wisconsin aeronautics

commission, who objected to it on the ground that a multiplicity of towers on Rib Mountain would constitute hazards to air navigation. The director requested that the TV Corporation apply to the Conservation Commission for a lease of land so that in the interests of air safety there could be erected on Rib Mountain but one tower to accommodate all the radio and television facilities. The TV Corporation then entered into negotiations with the Conservation Commission which culminated in the agreement and lease in question.

The Conservation Commission leased to the TV Corporation, for an annual rental of $100, the 140-foot-square parcel of land above referred to for a term of fifteen years, renewable for another fifteen years by mutual consent. By the terms of the agreement and lease the TV Corporation was to erect, maintain, and operate, at its own expense and without expense to the state, a television and radio-transmitting tower and a television-transmitting building. The tower built by the TV Corporation is 535 feet in height, with a television antenna extending an additional 113 feet higher, or a total height of 648 feet above the ground. The structure is anchored by groups of guy wires to three anchor bases located about 300 feet from the bottom of the tower. The agreement and lease provided that all the existing communication facilities in use on Rib Mountain should be transferred to and installed on the new tower by and at the expense of the TV Corporation; and detailed technical specifications for the protection of the state-owned facilities were included. The Radio Council's facility is at the height of 535 feet. Also at the corporation's expense the Radio Council's building was enlarged and the addition houses the corporation's television and radio equipment. The lease provided that upon termination of the agreement the transmitting building shall become the property of the state.

Throughout the negotiations for the lease it was understood that the TV Corporation would acquire and transfer to the Conservation Commission, as part of the consideration, the 100–110 acres of land then owned by the Record-Herald Company. The transfer was not included in the agreement and lease, but deeds to said lands were executed and delivered by the TV Corporation to the state and accepted by the Conservation Commission on September 17, 1958. The delay was occasioned by the necessity of making an appraisal so that a fair price could be put on the land at the time the TV Corporation purchased it from the Record-Herald Company. A survey was also necessary since, in the conveyance to the state, 100 acres were to be conveyed outright but 10 acres in the north portion were to have a reservation for the protection of the interests of the TV Corporation in the event the lease was not renewed.

Relator first contends that the lease in question is in violation of sec. 3a, art. XI of the Wisconsin constitution. That section provides:

"The state or any of its . . . cities . . . may acquire by gift, . . . purchase, or condemnation lands for establishing, laying out, widening, enlarging, extending, and maintaining memorial grounds, streets, . . . squares, parkways, boulevards, parks, playgrounds, sites for public buildings, and reservations in and about and along and leading to any or all of the same; and after the establishment, layout, and completion of such improvements, may convey any such real estate thus acquired and not necessary for such improvements, with reservations concerning the future use and occupation of such real estate, so as to protect such public works and improvements, and their environs, and to preserve the view, appearance, light, air, and usefulness of such public works."

Relator's argument is that the constitutional provision restricts the power of the legislature to authorize a lease of

state park lands and that such restrictions have not been complied with. This court has held that the section is a grant of power and not a restriction on the power of the legislature. As stated in *State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 53, 72 N. W. (2d) 577:

"We are obliged to determine that the provision is a grant of power which broadened the authority of the state and cities in the matter of excess condemnation in relation to the rights of the state and cities which had existed in such respects previous to the adoption of the provision."

See also *Newell v. Kenosha* (1959), 7 Wis. (2d) 516, 96 N. W. (2d) 845.

Relator relies on *Cutts v. Department of Public Welfare* (1957), 1 Wis. (2d) 408, 414, 84 N. W. (2d) 102, where this court held there was no violation of sec. 3a, art. XI, Const., in the transfer of property from one department of the state to another. In that case this court said:

"We construe sec. 3a, art. XI, in so far as applicable to the conveyance of excess state-owned lands, as operative only in a situation where title is transferred out of the state to some other entity or person."

This is not to say that a conveyance of such lands to a private entity would violate the section. There is nothing in the *Cutts* opinion to indicate a change in the court's view previously stated in *State ex rel. Thomson v. Giessel, supra,* and affirmed in *Newell v. Kenosha, supra,* in 1959.

So far as necessity of the leased land for park purposes is concerned, it is to be noted that the area involved is .45 of an acre, amounting to .082 per cent of the total park area of some 550 acres. To remove .082 per cent of the park area from use by the public for camping, recreation, etc., in no way interferes with the enjoyment of the park by the public.

Neither can it be said that the tower structure violates the constitutional requirement that the view, appearance, light, air, and usefulness of the park be preserved. Since 1949 the Radio Council tower has been located within 50 feet of the present tower and has occupied about the same amount of land at its base. No one ever suggested that the radio tower destroyed the view, light, air, and usefulness of the park. Manifestly, it did not. Nor does the present tower, which is a similar structure except that it is much higher. As pointed out in the oral argument, the beauty of the park is enjoyed by more campers and picnickers from the ground than from an airplane. And the tower is not so placed that it interferes with a view not found in abundance elsewhere in the park.

By sec. 27.01 (2), Stats., the Conservation Commission is given charge and supervision of the state-park system to carry out the purposes stated in sub. (1) to be:

"It is hereby declared to be the policy of the legislature to acquire, improve, preserve, and administer a system of areas to be known as the state parks of Wisconsin. The purpose of the state parks is to provide areas for public recreation and for public education in conservation and nature study. An area may qualify as a state park by reason of its scenery, its plants and wildlife, or its historical, archaeological, or geological interest. The conservation commission shall be responsible for the selection of a balanced system of state park areas and for the acquisition, development, and administration of the state parks. No admission charge shall be made to any state park."

The various powers granted to the Conservation Commission in sub. (2) of sec. 27.01, Stats., include:

"(f) Grant concessions or franchises for the furnishing of supplies or facilities and services on the state parks considered necessary for the proper comfort of the public.

"(g) Lease parts or parcels of state park land or grant easements thereto. . . .

"(i) Establish and operate in state parks such services and conveniences and install such facilities as will render such parks more attractive for public use and make reasonable charges for the use thereof."

Sec. 26.08 (1), Stats., provides:

"Said commission may, from time to time, lease for terms not exceeding fifteen years, parts or parcels of state park lands or state forest lands; and such leases shall contain proper covenants to guard against trespass and waste. The rents arising therefrom shall be paid into the state treasury to the credit of the proper fund. . . ."

Sec. 24.40 (1), Stats., provides:

"Every board, commission, department, and agency of the state having real estate belonging to the state under its control is authorized and empowered to grant easements in said property for public-utility service through, over, along, or to said property, including without limitation by enumeration the necessary poles, wires, structures, lines, conduits, pipes or pipelines for heat, light, water, gas, sewer, power, telephone, telegraph, and transmission of messages."

Relator contends that the power granted to the Conservation Commission in sec. 27.01 (2) (g), Stats., to enter into leases and grant easements with respect to state park lands is restricted to park purposes only. In none of the applicable statutes has the legislature so declared, and in the absence thereof we cannot read into the statutes anything which would preclude the Conservation Commission from entering into this lease. Indeed, the public policy expressed in sec. 24.40 (1), authorizing easements in state lands to public-utility companies, clearly indicates that the legislature contemplated uses of portions of park lands for other than park purposes. It must also be observed that a number of electric-transmission towers through a state park area would

very likely interfere with the aesthetic enjoyment of the park to a much-greater degree than a single high tower.

Relator fears that if portions of state park lands may be used for anything other than purely park purposes, the Conservation Commission could, by use of the fifteen-year-lease device, completely extinguish the right of the public to use park lands. We see no grounds for such apprehension. The same kind of argument was advanced in the *Cutts Case, supra,* and this court said (p. 418):

"We fully concur in plaintiffs' views that it would be a betrayal of the interests of the people if a diversion in use were attempted of any *substantial* portion of state forest lands, which would terminate their usefulness for forestry purposes. However, we are confident that such a substantial diversion and destruction of our state forests by legislative action is not within the realm of probability in the foreseeable future. Should it ever threaten, recourse must be had to an informed and aroused citizenry to prevent it, and not to the courts to impose a restriction on legislative power not found in our state constitution."

There are many benefits, not inconsistent with park purposes, which the public derives from the lease in question. The Radio Council station WHRM, which is a state educational station, had an effective range from its 208-foot tower encompassing an area of 14,500 square miles. With its transmitting facilities at 535 feet on the new tower, its range has been increased to 21,650 square miles, providing the benefit of its broadcasts to many citizens of this state who could not previously receive them.

The record is replete with the affidavits of residents in northern and central Wisconsin who receive television service that they could not receive prior to the erection of the new tower. Such service includes many programs pertaining to conservation, weather, and nature study, some originating with the State Conservation Department itself. These

affidavits express recognition of increased educational, cultural, entertainment, and economic values to their communities by the extension of the television facilities of WSAU-TV.

In his affidavit the chief of police at Wausau states that the increased range of both radio and television signals from the new transmitting facilities on the present tower is a "singular benefit to the police department in disseminating information to the public, making announcements more effective by covering a wide audience."

The secretary of the Wausau chamber of commerce states that the new tower greatly improves television reception by residents of Marathon county and northern Wisconsin and that the tower itself is an attraction for visitors to Rib Mountain State Park.

There is an affidavit by the superintendent of the Wood County Hospital at Marshfield emphasizing the therapeutic benefit to the hospital's 250 mental patients derived from the telecasts of WSAU-TV since the present tower facilities have been in operation.

There is not a dissenting voice in these affidavits. We must conclude that the lease, by permitting the use of the leased area in Rib Mountain State Park to accomplish the extension and improvement of radio and television transmission, has provided benefits to the public far outweighing the .45-acre diminution of the park and the insignificant interference with the use of the park by campers, etc.

It must also be remembered that this lease is the end result of negotiations requested by the director of the Wisconsin aeronautics commission. It accomplishes the combination of all transmitting facilities on Rib Mountain in one tower, thus promoting the interest of the public in air safety—a commendable example of co-operation between state agencies.

It is contended that the power of the Conservation Commission to lease and to grant easements to state park lands under secs. 27.01 (2) (g) and 26.08 (1), Stats., constitutes an unlawful delegation of legislative power. In *State ex rel. Wisconsin Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 505, 220 N. W. 929, this court said:

"The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate—is a power which is vested by our constitutions in the legislature and may not be delegated."

In *Milwaukee v. Sewerage Comm.* (1954), 268 Wis. 342, 351, 67 N. W. (2d) 624, it was said:

"The true test and distinction whether a power is strictly legislative, or whether it is administrative and merely relates to the execution of the statutory law, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter, no valid objection can be made. [Citing cases.]"

The commission's power to lease is not an unconstitutional delegation of the power to legislate, under the principle referred to in the *Whitman Case,* because the power to lease, taking into consideration the restrictions thereto in sec. 26.08, Stats., is not a power to declare whether or not there shall be a law or to determine the general policy to be achieved by a law or to fix the limits within which a law shall operate. Under the rule of *Milwaukee v. Sewerage Comm., supra,* the power to lease in the instant case is not an unconstitutional delegation of the power to legislate because the power to lease does not involve discretion as to

what a law will be, but merely relates to its authority as to its execution.

The legislature has provided the following restrictions to the commission's power in sec. 26.08 (1), Stats.:

"Said commission may, from time to time, lease for terms not exceeding fifteen years, parts or parcels of state park lands or state forest lands; and such leases shall contain proper covenants to guard against trespass and waste. . . ."

Accordingly, the Conservation Commission's power to lease is not unrestricted, and it is not an unlawful delegation of legislative powers.

The lease provides that, in the event other commercial television or radio stations desire to use the leased site, the approval of the Conservation Commission shall be obtained, whereupon the agreement will be subject to renegotiation; should disagreements arise, they are to be submitted to the arbitration of an umpire appointed by the Dane county circuit court. Relator questions the commission's authority in such matters, but it is unnecessary to discuss the question since it is moot. The record shows that under the rules of the federal communications commission no new channel can be located on Rib Mountain.

Relator also contends that the terms of the lease affect the appropriation powers of the legislature. Under sec. 26.08 (1), Stats., rents from the lease of park and forest lands shall be paid into the state treasury to the credit of the proper fund. The proper fund would be the conservation fund provided for in secs. 20.280 (70) and 25.29 which further provide that "No money shall be expended or paid from the conservation fund except in pursuance of an appropriation by law." The fact is that no appropriation is called for in this case since the construction and maintenance provided for under the lease are not at the cost of the state but of the TV Corporation. It is stated in relator's brief that

the statutory procedure "cannot be bypassed by the simple device of having the lessee 'pay the rent' directly to the various state agencies." There is nothing in the record to support such a statement. So far as the record shows, the rent is being paid into the state treasury to the credit of the proper fund, as required by sec. 26.08 (1).

It is argued that the state agencies have no authority to obtain improvements to their facilities at the cost of the TV Corporation, since such improvements normally require legislative appropriation. No authorities are cited for this unique position taken by the relator. The state facilities on Rib Mountain had been established and were being maintained by the various state agencies under appropriations of the legislature. As a result of the lease these facilities are improved at no extra cost to the state. Taxpayers generally have benefited from the substantial saving to the state which resulted from this agreement and lease.

Finally, it is relator's contention that as a matter of law the consideration for the lease is insufficient. It is argued in his brief:

"A nominal consideration of $100 a year as a matter of law cannot remotely reflect the real value of the privilege that is granted by the state to this private enterprise."

It would appear the relator is under the erroneous impression that the Conservation Commission gave to the TV Corporation a right to go into the television business on Rib Mountain. This right was given to the corporation by the federal communications commission. The question is whether $100 per year is based upon the fair rental value of the land leased, .45 of an acre.

After making a detailed analysis of the area and a study of the sales of comparable pieces of real estate on Rib Mountain, a qualified appraiser concluded that the fair

market value of the fee-simple title of said property, including accompanying easements, was $250 and that the fair rental was $15 per year. The record shows that the "comparables" considered were about 2,600 feet from the leased land and at about the same altitude. One was two square acres leased for ninety-nine years at an annual rental of $100. Another was 42 acres leased at $1 per year with an escalator to $1,100 per year in the event a tower is built. Another "comparable" was an option for one acre for a tower site, the purchase price being $600.

Other benefits received by the state include the use of the 535-foot tower for the Radio Council facilities as against its previous 210-foot tower; free space for educational television antenna when needed; free space for the facilities of the Conservation Commission's forest-protection network; free space for the FM antenna of the Radio Council; free space for the transmitting antenna of the traffic patrol of the Wisconsin motor vehicle department; additions to the existing building which will revert to the state at the termination of the agreement; and the benefits of television service to residents of north central Wisconsin which have been mentioned above—all without maintenance costs. Cf. *State ex rel. State Historical Society v. Carroll* (1952), 261 Wis. 6, 51 N. W. (2d) 723.

There is, in addition, the deed given by the TV Corporation to the state of 100 acres of contiguous land. Relator maintains this was a mere gratuity and no part of the consideration for the lease. The minutes of the Conservation Commission of June 21, 1957, included a statement by one of the commissioners with respect to previous negotiations with the TV Corporation that the corporation "would donate 110 acres of land on the mountain immediately adjacent to park land." Appearing before the committee on lands on October 11, 1957 (the date the agreement and lease was

ratified), the president of the TV Corporation made certain comments which were noted in the committee's minutes as follows:

"Mr. Frechette then pointed out that in addition to the $100-per-year rental, his company is prepared to make a grant of 100 acres of land adjacent to the state park property. He commented that that factor has not been mentioned in much of the publicity although it constitutes quite a valuable consideration."

The deeds were in fact executed, delivered, and accepted by the Conservation Commission on September 17, 1958. The letter tendering the deeds contained the following language:

"We understand that upon acceptance of this deed by the formal action of the Conservation Commission, the existing lease from the state of Wisconsin to the Wisconsin Valley Television Corporation will stand amended to reflect the true intent of the parties to such lease as understood by the commissioners at the time the lease was executed, and this deed is delivered only upon such condition."

In the resolution accepting the deeds the Conservation Commission used the following language:

"Whereas in the negotiations over a TV tower-site lease in the Rib Mountain State Park between the Wisconsin Conservation Commission and the Wisconsin Valley Television Corporation, the corporation made clear it would transfer 100 to 110 acres of land contiguous to Rib Mountain State Park to the state of Wisconsin as part of the consideration for such lease; . . ."

We have discussed the matter in some detail to show that the lower court correctly held that the question of the adequacy of the consideration involves a disputed issue of fact which cannot be disposed of by trial on affidavit.

We may say that there is some suggestion by relator that the Conservation Commission is limited to leases for money only. We find nothing to that effect in either sec. 26.08 (1) or sec. 27.01 (2) (g), Stats. It seems obvious that if the commission has a choice of renting property for money or taking property which may be more valuable than money, it has both the right and the duty to take the property. Since the proposition would seem too clear for argument, we will not further lengthen this opinion by distinguishing the cases upon which relator relies.

*By the Court.*—Order affirmed.