**FIRST WISCONSIN BANKSHARES CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant (two cases).**

**Nos. 71–C–328, 71–C–329.**

United States District Court, E. D. Wisconsin.

Dec. 18, 1973.

Foley & Lardner by James P. Brody, Joseph R. Barnett, David Slook, Milwaukee, Wis., for plaintiff.

Thomas R. Jones, Justice Dept., Washington, D. C., David B. Bukey, U. S. Atty., Milwaukee, Wis., for defendant.

### DECISION

MYRON L. GORDON, District Judge.

These are consolidated actions for the recovery of corporate income taxes. The taxpayer claims that various adjustments which were made to its taxable income for the years 1962 through 1965 were erroneous and illegal. Three issues are before me:

Issue I. Whether, for the purpose of calculating the bad debt reserve of the taxpayer's affiliated banks, certain "interim construction" loans made to

Wisconsin Building Corporations should have been excluded from the loan base on the grounds that they were indirectly insured or guaranteed by the government.

Issue II. Whether a donation to a charitable organization of certain notes, previously written off as worthless by one of the taxpayer's affiliated banks, operated as an off-setting "recovery" or was an anticipatory assignment of income, although the notes were not collected until after the assignment.

Issue III. What is the proper value of a bank building which the taxpayer donated to Milwaukee county for purposes of a charitable deduction.

The parties have stipulated as to the facts with regard to the first two issues. Issues of fact going to the third issue were heard by me at a bench trial on October 17, 1973. The parties have also filed extensive briefs. I conclude that the taxpayer should prevail as to issues I and III and that the government should prevail as to issue II.

## THE BAD DEBT RESERVE

The taxpayer computed its affiliated bank's deductions for bad debts by use of the reserve method. See 26 U.S.C. § 166(c). Under this method, a bank establishes on its books a reserve for bad debts and each year it is allowed a deduction from income for an addition to such reserve, rather than a deduction for specific bad debts. The amount of the deduction for additions to the reserve is computed by reference to a bank's loan base.

Included in the taxpayer's loan base during the taxable years involved in these actions were certain loans to the Wisconsin State Colleges Building Corporation, the Wisconsin University Building Corporation and the Wisconsin State Agencies Building Corporation, which are non-profit corporations. They are not agencies or instrumentalities of the state. The "interim construction" loans made to them by the

taxpayer's affiliated banks were used to pay for the construction of particular buildings, and were to be repaid from the proceeds of public sales of bonds of the building corporations.

In virtually every case, the building corporation had entered into separate agreements with the federal Housing and Home Finance Agency (HHFA), whereby the HHFA agreed to purchase the building corporations' bonds on condition that the bonds were first unsuccessfully offered for public sale, and provided further that the facilities involved were constructed in accordance with HHFA specifications. The taxpayer's affiliated banks were not parties to these agreements between the building corporations and the HHFA. At no time did the HHFA directly insure or guarantee repayment of the loans to the taxpayer's affiliated banks.

While the taxpayer maintains that the "interim construction" loans may have been made to the building corporations in the absence of an HHFA agreement, the fact remains that the taxpayer's affiliated banks never consummated an "interim construction" loan on any given project until the HHFA had made its above-described conditional commitment to the building corporation. All of the loans were ultimately repaid.

The taxpayer paid no federal income tax on the interest it received on the building corporation loans because, in private rulings, the internal revenue service had determined that the building corporation bonds, whose proceeds were assigned to the taxpayer as collateral, had been issued "on behalf of" the state of Wisconsin and that the interest on the bonds was exempt from federal income tax. See 26 U.S.C. § 103.

The government contends that it was within the discretion of the commissioner of internal revenue to determine that the above-described loans were indirectly insured or guaranteed by a government for purposes of Rev.Rul. 68–630, 1968–2 Cum.Bull. 84.

However, the fact remains that, had the building corporations failed to complete a particular project, through calamity or otherwise, or failed to comply in all respects with their agreements with the HHFA, the taxpayer's affiliated banks, as interim lenders, had only the building corporation's own resources to look to for payment. Under Wisconsin law, none of the loans involved here created any state debt or constituted an extension of state credit to the building corporations in the form of a guarantee or otherwise. See State ex rel. Thomson v. Giessel, 271 Wis. 15, 30, 72 N.W.2d 577 (1955). An element of risk therefore attended the making of the loans to the building corporations, regardless of the reasonable expectations of repayment.

I believe that the term "indirectly insured", as used in Rev.Rul. 68–630, must, under any reasonable construction, relate to loans which, although not made directly to a government, but rather to a third party, nevertheless contain a guarantee on the government's part to repay the lender under all circumstances.

■ Because an obligation is tax-exempt as being issued "on behalf of" a state for purposes of § 103, it does not necessarily follow that it is also an obligation of the state or insured or guaranteed by the state for bad debt purposes. A loan may well have enough relationship to a government to warrant tax exemption but still, because it is not insured or guaranteed by a government to the exclusion of possible loss, it may properly remain in the loan base. For purposes of computing reasonable additions to a bank's bad debt reserves, a bank's loan base includes all loans except those on which the bank cannot suffer a loss. See Rev.Rul. 68–630 supra.

■ I conclude, therefore, that these "interim construction" loans were properly includable in the loan base of the taxpayer's affiliated banks for purposes of computing the deductions for reasonable additions to their reserve for bad debts.

## THE "WORTHLESS" NOTES

In 1961, the taxpayer took a bad debt deduction for certain notes which were determined to be worthless by the national banking examiner. On its 1964 income tax return, the taxpayer claimed a charitable contribution deduction for its donation of the "worthless" notes to the First Wisconsin Foundation. The notes were repaid shortly after this assignment.

Neither the amount nor the propriety of either the bad debt or the charitable contribution deductions is in issue. There is a question as to whether the economic benefit which accrued to the taxpayer when it took the charitable contribution deduction constituted a "recovery" offsetting the earlier bad debt deduction. A second question is whether the taxpayer realized income because the notes were paid to its donee shortly after the charitable assignment thereof.

The interpretation of Treas.Reg. 1.-111–1(a)(2), as well as the applicability of the anticipatory assignment of income theory, are central to the resolution of these questions.

■ Treas.Reg. 1.111–1(a)(2) equates the recovery of a bad debt with the "receipt of amounts in respect of the previously deducted . . . items." It is clear that the economic benefit which accrued to the taxpayer when it made the *initial* write-off of the bad debt did not constitute a "recovery" for these purposes. However, I conclude that the taxpayer did realize an offsetting "recovery" to the extent that it claimed a *later* tax benefit in the form of a charitable contribution deduction for the donation of the same notes which were previously written off as "worthless".

Having placed a value upon those notes for the purpose of claiming the charitable contribution deduction, the taxpayer was estopped from asserting the non-existence of an offsetting "recovery". The taxpayer cannot successfully argue, on the one hand, that what it gave away had no value, and that it

should not be charged with the tax consequences of a "recovery" on the notes, while urging, on the other hand, that what it donated was indeed something of value and that it is deserving of a tax break in the form of a charitable contribution deduction.

The taxpayer demonstrated ingenuity in exercising its prerogative of utilizing the tax laws so as to produce for itself a device by which it might recover something of economic value, i. e., a second tax break, with respect to its otherwise "worthless" notes. But the taxpayer must offset the amount of its "recovery" as against its prior bad debt deduction by crediting its reserve to the extent of the economic benefit derived from its "double deduction" technique.

■ The taxpayer also contends that it did not realize income when the notes were repaid to its donee shortly after the assignment thereof. The taxpayer argues that because there existed here a bona fide assignment of ownership of the notes, which were not due for payment and as to which there existed a contingency as to collectibility, that it has distinguished away Commissioner v. First State Bank of Stratford, 168 F. 2d 1004 (5th Cir. 1948), cert. den. 335 U.S. 867, 69 S.Ct. 137, 93 L.Ed. 412. The latter case is cited by the government in support of its position that the theory of "anticipatory assignment of income" is applicable.

In *Stratford*, the bank distributed notes, previously written off as worthless, to its stockholders. The notes were repaid. In holding that the bank had made an anticipatory assignment of that income, the *Stratford* court equated the notes with dividends for the purpose of demonstrating that, having already received a tax *benefit* in the form of the bad debt write-off thereof, the bank was attempting both to grant its stockholders a dividend and at the same time avoid the tax *consequences* of an offset should there be realized a "recovery" on the notes.

In both the instant case and in *Stratford*, the taxpayer would benefit most if it never "recovered" on the bad debts previously written off. In each case, it was the existence of a previous bad debt deduction for "worthless" notes which created a cogent motive for the taxpayer to assign anticipated income thereon; thus, in the event of a "recovery" on the notes, the full effect of the bad debt deduction might be enjoyed while, at the same time, each was paying a dividend to its shareholders or making an attempted "double deduction" charitable contribution of the notes to its favorite, and namesake, charity.

I conclude, therefore, that the theory of "anticipatory assignment of income" is applicable here; when the taxpayer's donee received repayment of the notes which were assigned to it by the taxpayer, the taxpayer realized income therefrom to the extent of that portion of those note repayments which constituted interest; and that the amount received in repayment constituted a "recovery" pursuant to Treas.Reg. 1.111–1(a)(2) which must be credited to the taxpayer's reserve for purposes of offsetting the previous bad debt deduction taken with regard thereto.

### THE BUILDING DONATION

In 1964, the taxpayer donated a 52-year old bank building to Milwaukee county. The taxpayer claimed a charitable contribution in the amount of $650,000, having valued the property on the basis of three appraisals ranging from $600,000 to $700,000. Each appraiser had concluded that the building constituted a "special purpose" property for which the reproduction cost method less depreciation constituted the only meaningful measure of market value.

In challenging the taxpayer's deduction figure, the government maintains that the value of $293,000, which was placed upon the building and land by the city of Milwaukee in 1965 for property tax assessment purposes, represents the maximum amount allowable for the deduction.

The government maintains that § 2.04, Rev.Proc. 66–49, 1966–2 Cum. Bull. 1257, which states that "fair market value depends upon value in the market and not on intrinsic worth", means that intrinsic worth is not a factor in market value and that the taxpayer's method of appraisal was therefore erroneous. However, I believe that, while the section obviously emphasizes that objective market value is the ultimate test, it does not totally exclude the consideration of essential value to the extent it has a bearing on market value. Indeed, § 2.04 states that "all factors bearing on (fair market) value are relevant", including the factor of "cost of reproduction".

I am satisfied that the taxpayer has demonstrated the existence of a probative correlation between the cost of reproduction and fair market value, as required in Rev.Proc. 66–49, supra. Three independent appraisals indicated that the fair market value of the property was between $600,000 and $700,000. They each determined that it was a "special use" or "special purpose" property, the highest and best use for which would be as a museum or other public or institutional building; accordingly, each used the reproduction cost less depreciation method for determining fair market value.

Each appraiser found the income method of valuation to be inapplicable to such special use property because few if any special purpose properties are ever rented, and therefore, no comparable rented properties exist to which one could look in the valuation process. The market approach was used to value the land, and such appraisal was found to be fair by the government. However, the taxpayer's appraisers considered the market method inapplicable to the determination of the fair market value of the building because there was no evidence of sales prices for other similar properties. That the reproduction cost less depreciation was the proper method of de-

termining the fair market value of the property is further borne out by the fact that other unique properties in Milwaukee county have been so valued.

Under certain circumstances, the government's argument that the market value determinations arrived at by the city for property tax assessment purposes would be a cogent one. However, several factors present in this case lead me to conclude that use of the tax assessment figures for this purpose would be inappropriate. For one thing, the city's valuations were made at a time when the bank building *qua* bank building was losing value. The area of town in which it was located was deteriorating rapidly, and the exhibits of the taxpayer indicate that in lowering the valuation of the property for tax purposes, the city did place weight on the fact that that particular bank building was losing customers and employees. Moreover, the taxpayer conditioned the donation of the building upon the county's agreement to use it as a public building, retaining its exterior architecture substantially unaltered. Thus, while the building may well have been a "white elephant" in the hands of the taxpayer for purposes of its utilization as a bank, the gift was of a special use property, not of a bank building.

I conclude that the taxpayer has met its burden of proof in demonstrating that the fair market value of the donated property was $650,000 as of the date of the charitable contribution. Furthermore, I conclude that the determination of the government was erroneous to the extent that it was based upon a complete disregard for the peculiar nature of the property.

The plaintiff is entitled to judgment with regard to issues I and III, and the defendant is entitled to judgment with regard to issue II. The plaintiff's counsel are instructed to submit a proposed order for judgment and to incorporate therein a section favorable to the defendant on issue II.