CONTINENTAL ILLINOIS NATIONAL BANK & TRUST COMPANY OF CHICAGO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4473–73. Filed December 5, 1977.

*Edward C. Rustigan* and *Sean T. Crimmins*, for the petitioner.

*Seymour I. Sherman*, for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1968 in the amount of $376,950.59.[1]

Certain issues having been settled by the parties, the following issues remain for our decision:

(1) Whether the donation of appreciated Tastee Freez common stock to a charitable foundation resulted in the recovery of a previously deducted item which must be returned to income under the tax benefit rule; and

(2) Whether in the light of the *Corn Products* doctrine, the gain realized by petitioner on the sale of its stock in the Credit Bureau of Cook County, Inc., is reportable as ordinary income or capital gain.

### FINDINGS OF FACT

Petitioner is a national banking association chartered under the laws of the United States, with its principal office and place of business in Chicago, Ill. It filed its Federal income tax return (Form 1120) for the calendar year 1968 with the District Director of Internal Revenue at Chicago, Ill.

By agreement dated April 4, 1963, the LaSalle National Bank of Chicago (LaSalle) entered into a financing arrangement with Allied Business Credit Corp. (Allied), and its parent company, Tastee Freez Industries, Inc. (Tastee Freez), relating to certain deferred payment paper issued in connection with the sale of mobile trucks by Tastee Freez or its predecessor. Tastee Freez and its subsidiaries sold these units to Tastee Freez franchise holders and operators and other interested parties. These mobile units were "stores on wheels" equipped to dispense Tastee Freez ice cream products and, in some cases, food products as well. The mobile units were sold on conditional sales contracts or chattel

---

[1] In his statutory notice of deficiency, respondent determined a deficiency in petitioner's 1968 Federal income taxes in the amount of $369,970.67. However, in his amended answer, filed on May 8, 1975, the amount of the deficiency presently asserted by respondent was increased to $376,950.59.

mortgages. The financing was handled by Allied and the contracts were then sold to banks and other lending institutions.

The agreement between LaSalle and Allied provided with regard to the deferred payment paper that:

Allied may offer Contracts to the Bank for purchase hereunder from time to time with full recourse as hereinafter set forth. The Bank shall be entitled to purchase such Contracts as it in its sole discretion shall determine to purchase. The purchase price to be paid by the Bank for each Contract so purchased shall be an amount equal to the unpaid balance thereof (including all finance charges or interest thereon).

The agreement specifically described the contracts involved which were sold by Allied with full recourse, as follows:

The term "Contracts" as used herein shall mean all valid conditional sales contracts, chattel mortgages and other title retaining or lien giving instruments and notes, if any, issued in connection with the sale by Tastee Freez or its predecessor of both mobile trucks and store equipment, which Contracts were acquired by Allied in the normal course of its business.

The agreement also contained provisions relating to the custody of the specific contracts sold and the ledger sheets recording payments by each obligor on the contract, and preserved certain remedies for failure to perform on the part of the obligor. Additionally, both Allied and Tastee Freez unconditionally guaranteed payments of all principal, finance charges, and interest due on each contract sold and agreed to repurchase any specific contract on which the obligor defaulted. Tastee Freez also unconditionally guaranteed the performance of Allied's obligations under the agreement.

In a separate agreement between LaSalle and petitioner, petitioner undertook to purchase, upon request by LaSalle, participations in the amount of 66⅔ percent (rounded off to the nearest thousand dollars) in all the deferred payment paper purchased by LaSalle from Allied. Since LaSalle's agreement to purchase deferred payment paper under the April 4 agreement was limited to $3 million, petitioner was committed to purchase up to $2 million of such paper.

On September 4, 1963, Tastee Freez and Allied, and on September 5, 1963, Carrols, Inc. (a wholly owned subsidiary of Tastee Freez), which had also guaranteed some of the paper purchased by petitioner, filed petitions for an arrangement under chapter XI of the Bankruptcy Act. Petitioner filed and

was allowed unsecured claims in the three chapter XI proceedings as follows:

| Proceeding | Date filed | Amount of claim | Amount allowed |
|---|---|---|---|
| Tastee Freez | 12/22/63 | $995,011.99 | $995,011.99 |
| Allied | 1/27/64 | 995,011.99 | 995,011.99 |
| Carrols, Inc | 7/22/64 | 139,918.66 | 135,799.83 |

Each of the companies filed plans of arrangement with the appropriate Federal district court. Orders confirming these plans were filed on September 21, 1964, in the Tastee Freez case; May 5, 1965, in the Allied case; and April 2, 1965, in the Carrols, Inc., case. Pursuant to the plans, petitioner received the following:

(i) A 10-year subordinated debenture in the amount of $398,004.80 payable by Tastee Freez on or before September 21, 1974, issued under the plan of arrangement of Tastee Freez.

(ii) A 10-year subordinated debenture in the amount of $9,931.75 payable by Tastee Freez on or before September 21, 1974, issued under the plan of arrangement of Carrols, Inc.

(iii) A 10-year subordinated debenture in the amount of $79,600.96 payable by Allied on or before May 5, 1975, issued under the plan of arrangement of Allied.

(iv) Ten thousand eight hundred ninety-two shares of Tastee Freez common stock, distributed under the plan of arrangement of Tastee Freez.

Petitioner determined that these subordinated debentures and shares of common stock were worthless. For book purposes, it placed a nominal value of $1 on each debenture and a nominal value of $1 on the total of 10,892 shares of Tastee Freez common stock, crediting a total amount of $4 to its bad debt reserve.

On May 15, 1964, petitioner charged $400,000 to its bad debt reserve as a loss with respect to the underlying debt, as directed by the national bank examiner. On December 15, 1964, petitioner charged an additional $431,381.63 to its bad debt reserve as a loss with respect to that debt, also at the direction of the national bank examiner. Subsequently, petitioner realized recoveries with respect to the debt of Allied in the amount of $237,409.33 from sales of trucks which had been pledged as collateral security. Petitioner credited the recoveries to its reserve for bad debts, leaving a net charge to the reserve for bad debts with respect to the debt of Allied, as of July 1968, in the amount of

$593,972.30. This net charge of $593,972.30 resulted in a tax benefit.

In late 1967, Tastee Freez developed a plan seeking to induce the debenture holders to exchange their debentures for Tastee Freez common stock,[2] options on Tastee Freez common stock, or cash. Pursuant to this plan, petitioner and Tastee Freez entered into an agreement dated December 13, 1967, and petitioner under an instrument bearing the same date, granted Tastee Freez an option to exchange stock for the debentures held by petitioner in the total face amount of $407,936.55. Tastee Freez exercised this option by letter dated April 2, 1968. As a result of the exercise, petitioner surrendered the two Tastee Freez debentures, and received 34,266 shares of Tastee Freez common stock, resulting in total holdings by petitioner of 45,158 shares of Tastee Freez common stock[3]

On or about July 18, 1968, petitioner contributed its 45,158 shares of Tastee Freez common stock to Continental Bank Charitable Foundation (Foundation). Foundation is a tax-exempt organization, contributions to which are deductible under section 170.[4] In its corporate income tax return for the taxable year 1968, petitioner claimed a charitable deduction in the amount of $660,435.75, valuing the stock of Tastee Freez for this purpose at $14⅝ per share. Petitioner did not include in income, or credit to its reserve for bad debts, any amount in respect of the foregoing gift to the Foundation and charitable deduction claimed.

The Credit Bureau of Cook County, Inc. (CBCC), was incorporated on December 2, 1948, to provide credit information to retailers and other business entities in the Chicago area. CBCC was formed by several downtown Chicago retailers who wished to pool their credit information into a single source. The

---

[2]Tastee Freez common stock had been listed on the American Stock Exchange, but had been banned from trading following the filing by Tastee Freez of its petition under ch. XI. At a meeting of the board of directors of Tastee Freez on Oct. 21, 1966, it was noted that the debenture structure of the company was continuing to frustrate efforts to secure a lifting of that ban. The minutes of that meeting note as the probable solution the acquisition by the company of its outstanding debentures.

[3]On its corporate income tax return for the calendar year 1968, petitioner erroneously reported the difference between its basis in the two debentures ($2), and the fair market value of the Tastee Freez common stock on that date, as determined by it ($282,694.50), as long-term capital gain. The exchange was pursuant to a plan to recapitalize Tastee Freez, and thus petitioner should not have recognized any gain on the exchange.

[4]All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

pooling was made necessary by the great expansion of consumer credit in the years following the Second World War. Prior to that time credit was normally extended only to people of substantial means. During the late 40's however, an increasingly large percentage of the public began to utilize credit, first in their purchase of automobiles and appliances and later in purchasing retail merchandise generally. The pooling of credit information enabled these retailers to ascertain the credit worthiness of their customers more quickly and with greater reliability.

The amount of credit information increased as more stores became members of the bureau. Membership in the CBCC included the requirements that the member make its own credit information available to the bureau, and that it keep confidential the information it received. As consumer credit continued to grow in the 1950's and 1960's, CBCC expanded its credit data base by soliciting corporations representing various industries to become members of CBCC. Among those solicited were oil companies, real estate companies, small loan companies, and banks. Petitioner became a member of CBCC on May 5, 1953. In addition to the expansion of its credit information by the addition of member organizations, CBCC increased its files by acquiring other credit bureaus and agencies in the Chicago metropolitan area.

Members of CBCC were not required to purchase stock in the organization in order to avail themselves of its services. Members who were not stockholders of CBCC were treated the same as members who were stockholders with respect to credit information. Thus nonstockholder members received the same attention from the bureau as the stockholders and were charged the same as the stockholders for CBCC credit reports. In 1967 and 1968, CBCC supplied credit information to approximately 4,000 members in the Chicago metropolitan area.

In the mid–1960's CBCC, recognizing that the traditional methods of accumulating and reporting credit data were becoming unsatisfactory, began a program of automation. This need for automation took on even greater urgency as a result of Chicago banks entering the credit card business. The expense of automating, however, was substantial. In order to obtain the needed funds, CBCC planned a sale of its stock. In accordance with this objective, petitioner and another large Chicago bank,

the First National Bank of Chicago, were each offered 17.5 percent of the outstanding shares.

At the time of CBCC's offering in 1967, petitioner had a general desire, to the extent legally permissible, to undertake a moderate expansion of its commercial banking business into other closely related fields, such as consumer finance and mortgage companies. As a growth industry, the credit bureau field represented an attractive investment to the petitioner.[5]

Moreover, CBCC needed extensive capital to perform the information services required by petitioner for its credit card program. Without the financial support of petitioner and First Chicago, CBCC would be reluctant to so quickly accelerate its automation program.

On July 19, 1967, petitioner applied for a ruling from the Comptroller of the Currency that it could lawfully purchase the CBCC stock. Shortly thereafter, the Comptroller ruled in petitioner's favor, with the proviso that petitioner immediately write off the purchase price of the stock for book purposes.[6] On August 17, 1967, petitioner purchased 892.5 shares of the common stock of CBCC at $550 per share, for a total purchase price of $490,875.[7] The cost of the stock (less $1) was written off to undivided profits, consistent with the ruling of the Comptroller of the Currency, but was not deducted from taxable income

---

[5]During the period 1964 to 1968, CBCC received numerous offers to purchase all of its stock. These offers were not accepted for a variety of reasons, including the desire to have the bureau owned locally.

[6]The purchase was authorized pursuant to par. 7480 of the Comptroller's Manual for National Banks which reads as follows:

"National banks, as a necessary business expense, may make reasonable contributions to local community agencies and groups to further the physical, economic, and social development of their communities. Such contributions may take the form of an investment in a corporation organized to carry on such activities, but the aggregate investment in such corporations may not exceed 2% of the bank's capital and surplus."

[7]The owners of the stock of CBCC, following petitioner's acquisition were as follows:

Continental Illinois National Bank & Trust Co. of Chicago (Petitioner)
The First National Bank of Chicago
Marshall Field & Co.
Carson, Pirie, Scott & Co.
Wieboldt, Inc.
Montgomery Ward & Co.
Charles A. Stevens Co.

Petitioner and the First National Bank of Chicago are national banking institutions, and the other stockholders of CBCC were all retail department stores.

in the computation of petitioner's 1967 Federal income tax liability.

The acquisition of CBCC did not have any appreciable effect on where petitioner's employees sought credit information. These employees continued to use whatever source of credit information they thought best, and were not encouraged to use CBCC as opposed to other credit sources.

By 1968, it had become clear that the objectives of the several shareholders of CBCC had diverged, and that CBCC should be sold. The offers to purchase CBCC were evaluated not only on the basis of price but with a view to whether the potential purchaser would operate CBCC in a manner conducive to the best interests of the Chicago business community.

In September of 1968, all of the stock of CBCC was sold to Union Tank Car Co. Petitioner received $782,567.08 as a result of the sale of its shares, and reported the excess ($291,698.08) of the amount received over its cost as long-term capital gain. In the statutory notice herein, respondent determined that such gain was taxable as ordinary income.

## OPINION

### Issue I—Tax Benefit Rule

During 1963, petitioner purchased from the LaSalle National Bank a two-thirds interest in $3 million worth of conditional sales contracts and chattel mortgages that LaSalle had acquired from Allied Credit, a financing subsidiary of Tastee Freez. The individual contracts originated in sales by Tastee Freez of "stores on wheels" to its franchise holders and operators. The paper was guaranteed by Allied, Tastee Freez, and Carrols, Inc.

Petitioner filed claims in the chapter XI proceedings involving the guarantors, and subsequently realized some recoveries on the specific contracts involved from the sale of the trucks which had been pledged as collateral security by the primary obligors. Pursuant to the plan of arrangement confirmed in the bankruptcy proceedings, petitioner acquired two 10-year subordinated debentures of Tastee Freez and Tastee Freez common stock.[8]

---

[8]Petitioner also acquired a 10-year subordinated debenture in the amount of $79,600.96 from Allied. This debenture was not contributed to the Foundation and does not figure in the controversy before us.

Petitioner valued these acquisitions at $3, closed out the transactions, and took its loss.

In April of 1968, petitioner exchanged the Tastee Freez debentures for Tastee Freez stock, and in July of 1968, all of its Tastee Freez stock, now valued at $660,435.75, was donated to the Foundation and a charitable contributions deduction claimed in due course.

Respondent contends that, to the extent petitioner received debentures of Tastee Freez pursuant to the chapter XI proceedings, the debtor-creditor relationship was simply modified, and that "a technical debtor-creditor relationship" actually continued to exist. To the extent petitioner received Tastee Freez stock, respondent claims, "a part of its debt was connected in the *form* of an equity investment." Focusing on the underlying economic facts, regardless of the form, the argument proceeds, petitioner in 1964 wrote off as lost the $593,972.30, and in "1968 the corpse was resurrected, (as part of the larger charitable deduction of $660,435.75) and again utilized to reduce petitioner's otherwise taxable 1968 income."

Respondent argues that the receipt of the securities by petitioner is a normal, ongoing phase of petitioner's day-to-day banking operations; that its disposition, following a chargeoff of the original debt, is inevitably "the practical equivalent of a double deduction," condemned in *United States v. Skelly Oil Co.*, 394 U.S. 678 (1969); and this should "always" be viewed as relating back to the prior bad debt chargeoff with sufficient vitality "to invoke the tax-benefit rule."

Petitioner, not surprisingly, has an entirely different view of the matter. Petitioner contends that the substitution of the debentures and stock for the original guarantee of the chattel mortgages and conditional sales contracts closed the transaction, and required computation of gain or loss. Any subsequent gain was attributable to appreciation of the securities, a new and different investment involving quite different risks, and should be neither excludable if the prior loss was deducted without tax benefit, nor includable as ordinary income if the prior loss was deducted with tax benefit. Petitioner asserts that this argument has particular vigor in the present circumstances, since pursuant to the bankruptcy proceedings, the securities received were in satisfaction of the original obligation; Tastee Freez and Allied

were discharged from their initial liability; and petitioner could no longer sue thereon.

While hardly free from doubt, we agree with petitioner. We begin by emphasizing what is *not* at issue. Respondent concedes that the deduction for the contribution of the appreciated stock "is not in controversy, either as to its propriety or amount."[9] Similarly, petitioner concedes that assuming the other elements of the tax benefit rule are here present, there was a "recovery." See *First Wisconsin Bankshares Corp. v. United States*, 369 F. Supp. 1034 (E.D. Wis. 1973).[10] Cf. *Tennessee Carolina Transportation, Inc. v. Commissioner*, 65 T.C. 440 (1975), on appeal (6th Cir., Aug. 4, 1976).

The narrow issue before us, therefore, is simply whether the appreciation of the Tastee Freez stock must be related back for purposes of the tax benefit rule to the original conditional sales contracts and chattel mortgages guaranteed by Tastee Freez and Allied, or is attributable to a new investment in securities acquired pursuant to the bankruptcy proceedings that closed out the prior transaction for tax purposes. The parties have extensively analyzed *Allen v. Trust Co. of Georgia*, 180 F.2d 527 (5th Cir. 1950), cert. denied 340 U.S. 814 (1950), and *Waynesboro Knitting Co. v. Commissioner*, 23 T.C. 404 (1954), affd. 225 F.2d 477 (3d Cir. 1955), which we believe to be the controlling precedents. In *Allen v. Trust Co. of Georgia*, the taxpayer made a $400,000 loan to the Tom Huston Corp., which was secured by 60,000 shares of stock in the Tom Huston Peanut Co., a third corporation controlled by the borrower. In 1932, as a result of

---

[9]Indeed, the parties stipulated that "Respondent has not sought to disallow any part of the deduction so claimed and such deduction is not in controversy." Prior to 1970, a taxpayer who contributed appreciated property to a charity generally was allowed a charitable contributions deduction for the full fair market value of the property even though the appreciation was not included in income. In 1969, Congress enacted some restrictions on this practice in the case of gifts of ordinary income property, gifts of certain tangible personal property, and gifts to private foundations. Sec. 170(e), as amended by sec. 201(a), Tax Reform Act of 1969, 83 Stat. 549. Congress weighed the calculus of social interests, balancing the need for tax equity with the exigencies of private philanthropy. Even if the new provisions were applicable in substance to the facts herein, Congress did not make them retroactive, and we agree with the parties that questions of tax policy suggested by this issue should not influence our resolution of the distinctly different and separate issue presented for our decision.

[10]In *First Wisconsin Bankshares Corp. v. United States*, 369 F. Supp. 1034 (E.D. Wis. 1973), the taxpayer bank took a bad debt deduction in 1961 for certain notes which were determined to be worthless by the national bank examiner. In 1964, the financial condition of the debtor had improved and the taxpayer contributed the notes to a charitable organization, taking a charitable deduction for its contribution. The notes were repaid shortly after their assignment to the charitable organization. The court held that the taxpayer had a "recovery" when it claimed a charitable deduction for the donation of the same notes which were previously deducted as worthless.

the debtor's poor financial condition, the taxpayer took the pledged shares of stock "in full satisfaction and complete cancellation" of the debt. The bank sustained a loss of $220,000 on the transaction, but only $58,455.37 of this loss produced a tax benefit.

In 1940, the bank sold its remaining shares for $537,500 realizing a gain of $376,250. Although the bank reported the gain, it argued in its suit for refund that part of the gain should be excluded from income as a recovery on a bad debt for which it received no tax benefit. The court rejected this argument, finding that no debt existed in 1940 which could be recovered. The court reasoned as follows:

Moreover, this income did not arise from a payment by the debtor or from a sale of the debt. The pledged shares of stock had no more relation to the debt than the shares of *some totally unrelated* corporation would have had. The acquisition of the stock in satisfaction of the debt was not the summation or integration of two specified values, but it was a total termination of the debt and the beginning of a new and separate transaction. The shares of stock so acquired had their own independent basis for future gain or loss, which was the fair market value on the date of acquisition. [180 F.2d at 528. Citations omitted; emphasis added.]

This Court made a similar finding in *Waynesboro Knitting Co.*, *supra*. In that case, one of the officers of the taxpayer embezzled a total of $488,010.60 from the company. The taxpayer subsequently agreed to relinquish its claims against the embezzling officer in exchange for certain assets of the embezzler totalling $258,031.46. The taxpayer deducted the allocable portions of its net loss over the years of embezzlement, but realized a tax benefit on only $66,326.96. Among the assets transferred to the taxpayer in the settlement were certain insurance policies on the officer's life. The taxpayer paid the existing policy loans and subsequent premiums, and collected the proceeds of the policies on the insured's death. The taxpayer argued that the insurance proceeds constituted a partial recovery of the embezzlement loss which it had previously suffered and that those proceeds should be excluded from income under the tax benefit rule. We stated therein that:

the tax benefit rule may be invoked only where there is a recovery which is *directly attributable* to a previous loss which produced no tax benefit. As stated in *Merton E. Farr*, 11 T.C. 552 (1948), affirmed sub nom. *Sloane v. Commissioner*, 188 F. 2d 254 (C.A. 6, 1951), "one certain requirement for invoking it is that there be such an interrelationship between the event which

constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction." The requirement that there be an "integrated transaction" was made clear by the Supreme Court in *Dobson v. Commissioner, supra,* and followed in *Allen v. Trust Co. of Georgia,* 180 F.2d 527 (C.A. 5, 1950), certiorari denied 340 U.S. 814 (1950), a case whose facts are similar to those here involved. [23 T.C. at 407. Emphasis added.]

We then held that the original obligation was extinguished and the transaction closed by the 1931 settlement agreement, stating that "the assets 'so acquired had their own independent basis for future gain or loss, which was the fair-market value on the date of acquisition.' *Allen v. Trust Co. of Georgia, supra.*" See also *Agway, Inc. v. United States,* 207 Ct. Cl. 682, 524 F.2d 1194, 1200 (1975); *Smith v. United States,* 248 F. Supp. 873 (D. Md. 1965), revd. in part without discussion of this issue 373 F.2d 419 (4th Cir. 1966).

Similarly, petitioner herein originally purchased obligations secured by conditional sales contracts and chattel mortgages, with the promise of the primary obligor guaranteed by Tastee Freez and its subsidiaries. Petitioner filed claims against the guarantors in the chapter XI proceedings and salvaged what it could by selling some of the mobile units pursuant to the contracts involved. Petitioner began with an interest in individual obligations secured by conditional sales contracts, chattel mortgages, and guarantees, and ended up with debt and equity securities in Tastee Freez and Allied. These obligations were acquired pursuant to proceedings under the Bankruptcy Act that discharged Tastee Freez and its subsidiaries, and clearly precluded petitioner from suing on their original obligation. By virtue of these proceedings, "there was a total termination of the debt and the beginning of a new and separate transaction." The debt and equity securities "so acquired had their own independent basis for future gain or loss, which was the fair market value on the date of acquisition."[11] *Allen v. Trust Co. of Georgia, supra* at 528.

---

[11]Respondent contends that the ch. XI proceedings, unlike straight bankruptcy, simply provide for a "modification" of the debt in order to permit the debtor to arrange its affairs and meet, not avoid, its obligations. Petitioner, on the contrary, notes that the arrangement confirmed provided that the

We believe that *Allen v. Trust Co. of Georgia* states the settled rule in this area as it has existed for nearly 3 decades. Indeed, in Rev. Rul. 66–320, 1966–2 C.B. 37, 38, respondent, citing only *Allen v. Trust Co. of Georgia*, succinctly restates and reaffirms the principle of that case, as follows:

> X was indebted to Y in the amount of $5,000. In 1961, Y acquired property with a fair market value of $3,000 from X in partial satisfaction of the indebtedness due. The unsatisfied portion of the indebtedness ($2,000) was properly deducted as a bad debt by Y in 1961 without tax benefit. Y sold the property in 1965 for $5,000, realizing a gain of $2,000, and wishes to exclude the $2,000 from gross income under section 111 of the Code, on the ground that it represents the recovery of a bad debt deducted in 1961 without tax benefit.

> \* \* \* \* \* \* \*

> Under the above circumstances, the acquisition by the creditor of the property in partial satisfaction of the indebtedness is separate and distinct from the subsequent sale of such property, and the gain realized on such sale does not represent income attributable to a recovery of the unsatisfied portion of the original indebtedness. The tax result is the same as if the debtor, instead of giving the creditor the property, had paid the creditor $3,000 in cash, and the creditor had used this $3,000 to purchase other property. Clearly, section 111 of the Code would not be applicable to gain realized on the creditor's subsequent sale of such other property. See *Allen v. Trust Company of Georgia*, 180 F.2d 527 (C.C.A. 5th 1950), reversing 84 F. Supp. 944 (M.D. Ga. 1949).

> Accordingly, a creditor who sells property acquired in partial satisfaction of an indebtedness, cannot, under section 111 of the Code, exclude from gross income gain from such sale as representing income attributable to the recovery of a bad debt previously deducted without tax benefit.

Respondent accepts these principles but attempts, at two different points in his brief, to distinguish them with the following argument:

---

claims of unsecured creditors were "settled and satisfied by the payment to the holders thereof of forty percent (40%) of their respective debts \* \* \* ," and that the securities received actually had little or no fair market value. The parties also make different inferences relative to the mechanics of a discharge, the possibility of a revival of the old debt, and the necessity to plead a discharge if sued on the original debt. (But cf. sec. 17(c) of the Bankruptcy Act, 11 U.S.C. 35 (c)). We eschew this dialectical exegesis of bankruptcy terms, since when we reach the bottom line, which is sufficient for this case, the bankruptcy proceedings effectively eliminate any remedies petitioner had on the original debt. Both juridically and in economic substance, petitioner, after confirmation of the arrangement, was simply left only with the securities. See sec. 367 of the Bankruptcy Act, 11 U.S.C. sec. 767; sec. 371 of the Bankruptcy Act, 11 U.S.C.A. sec. 771; 9 Collier, Bankruptcy, par. 9.32 [1], 9.32 [14] (1976); MacLachlan, Bankruptcy, sec. 330, p. 392 (1956).

It should also be noted that the statutory provision with respect to tax benefit, as embodied in present *Code* section 111, is an *exclusionary* provision, enacted as a remedial measure to protect a taxpayer from being required to include in income amounts which were previously deducted *without* tax benefit. It does not purport to limit the includibility of any recovery of an item deducted *with* tax benefit. In *Allen v. Trust Co. of Georgia, supra,* the taxpayer, seeking to rely upon a specific statutory provision, failed because it could not bring itself squarely within its terms and intent.

We reject this analysis for two very good reasons. First, the tax benefit rule is a two-way street, sometimes favoring petitioner, sometimes respondent. Respondent's argument would make both lanes run in his favor. Secondly, the argument is predicated on a clearly erroneous understanding of the tax benefit rule. The tax benefit rule is both a rule of inclusion and of exclusion: the previously deducted item must be *included* in income in the year of its recovery but that portion of the recovery not resulting in a prior tax benefit is *excluded.* Whether a transaction is open or closed for tax benefit purposes does not in any manner depend on which aspect of the rule is in issue. The exclusionary aspect of the rule has no real existence apart from the inclusionary aspect, but merely acts as a limitation on the amount included. So integrated are these aspects of the tax benefit rule, in fact, that the statutory articulation of the rule in section 111 recites only its exclusionary aspect, and assumes the inclusion. As we recently stated on this specific point:

> The tax benefit rule is both a rule of inclusion and exclusion: recovery of an item previously deducted must be *included* in income; that portion of the recovery not resulting in a prior tax benefit is *excluded.* The rule in both aspects evolved judicially and administratively. The rule has been codified as to certain items in sec. 111. While focusing on the second aspect (exclusion), sec. 111 is predicated on the validity of the first aspect (inclusion). Although the rule has been partly absorbed in the statute, it has been expressly stated that the unabsorbed portion of the rule continues to apply. *Dobson v. Commissioner,* 320 U.S. 489, 506 (1943); *Alice Phelan Sullivan Corp. v. United States,* 381 F.2d 399 (Ct. Cl. 1967); *Capitol Coal Corp.,* 26 T.C. 1183 (1956), affd. 250 F.2d 361 (2d Cir. 1957); *Mayfair Minerals, Inc.,* 56 T.C. 82 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972); *Birmingham Terminal Co.,* 17 T.C. 1011 (1951). Sec. 1.111–1(a), Income Tax Regs. [*Putoma Corp. v. Commissioner,* 66 T.C. 652, 664 n. 10 (1976), on appeal (5th Cir., Mar. 14, 1977, by respondent, and Apr. 11, 1977, by petitioner).]

Respondent also cites *Bear Mill Manufacturing Co. v. Commissioner,* 15 T.C. 703 (1950), and *Birmingham Terminal Co. v. Commissioner,* 17 T.C. 1011 (1951). But in both of these

cases it is clear that the precise debt or charge that was previously written off was being repaid, and the payment was for precisely the identical amount—down to the penny—of the previously deducted item.

Finally, respondent eloquently embellishes his argument at several points with admonitions from *United States v. Skelly Oil Co.*, 394 U.S. 678 (1969), and *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952), about the evils of a double deduction. But this simply begs the question, assuming that we have one integrated transaction rather than two separate transactions in two different tax years, which is the very point at issue. We have, for the reasons set out above, decided this point against the respondent.[12]

The income tax is not a transactional levy. A transactional focus is justified, as in the unique facts of *United States v. Skelly Oil Co.* and *Arrowsmith v. Commissioner*, only when a transaction spanning more than 1 tax year is so integrally related that it must be viewed as a whole, rather than as separate transactions separately accounted for in the different tax years to which they relate. Even more to the point, neither of those cases in any way focuses on or even discusses the intersection between the tax benefit rule and the closed transaction rule that both parties agree is dispositive of this case.

Finally, we specifically note that in *United States v. Skelly Oil Co.*, *supra*, the Court, in sustaining respondent's position, expressed the following concern:

> In other situations when the taxes on a receipt do not equal the tax benefits of a repayment, either the taxpayer or the Government may, depending on [the] circumstances, be the beneficiary. Here, the taxpayer always wins and the Government always loses. We cannot believe that Congress would have intended such an inequitable result. [394 U.S. at 686].

Again, the case before us presents one of the "other situations" that did not concern the Supreme Court in *United States v.*

---

[12]Parading out the pejorative term "double deduction" effects an avoidance ambience that fails to compensate for the substantive inadequacies of respondent's case. One could as easily say that the closed transaction rule applied in Rev. Rul. 66–320, 1966–2 C.B. 37, imposes a tax on a return of capital or requires a "double inclusion" of income. As we have consistently noted, this is a two-way street we are negotiating. The avoidance ambience in this case is really centered on the ability to contribute appreciated property without including the gain in income, a problem no different in this than in cases not involving the tax benefit rule at all. As we noted earlier (see n. 9 *supra*) Congress carefully considered this problem in 1969. We see no reason to provide the equivalent of retroactive application of the new provisions added in 1969 by misapplying the tax benefit rule to a closed transaction.

*Skelly Oil Co., supra.* We are asked in this case to find the line separating the tax benefit rule from the closed transaction rule. The important policy considerations on which this line is predicated have been succinctly described as follows:

> The need to assess and collect taxes at fixed and relatively short intervals underpins the principle of taxation that transactions which may possibly be subject to further developments substantially altering their character for tax purposes should nevertheless be treated as final and closed so that their tax consequences can be determined. *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359 (1931); *United States v. Rexach*, 482 F.2d 10 (C.A. 1, 1973). On the other hand, a taxpayer should not be permitted to take advantage of this governmental exigency to establish a distorted picture of his income for tax purposes. It is this countervailing consideration which spawned the tax benefit rule. * * * [*Estate of Munter v. Commissioner*, 63 T.C. 663, 678 (1975) (Tannenwald, *J.*, concurring).]

Either petitioner or respondent may find that on one occasion the benefits are to be found on one side of the line, while on another occasion everything of advantage is located on the opposite side of the line. While either may on different occasions argue both sides of the question, attempting to move the line first one way, and then the other, we believe it best to leave the line right where it was placed in *Allen v. Trust Co. of Georgia*, 180 F.2d 527 (5th Cir. 1950), cert. denied 340 U.S. 814 (1950). Respondent is, on this occasion, on the wrong side of the line. See Rev. Rul. 66–320, 1966–2 C.B. 37.[13]

### Issue II—Corn Products Doctrine

The final issue is whether the gain realized by petitioner on the sale of its CBCC stock is reportable as ordinary income or capital gain. The resolution of this issue depends, of course, on

---

[13]As noted above, we need to measure taxable income in fixed, temporal units. Not surprisingly, given business and accounting practices, as well as the exigencies of Government finance, the temporal unit selected is the 12-month period—a 1 year period. Further erosions of the important policy considerations underlying the annual accounting period, thereby increasing the complexity of an already absurdly complex law, should be carefully balanced against the limitations of the tax benefit rule. To cite just one example, the tax benefit rule does not purport to equalize the tax liability over the separate years involved. The prior tax benefit may have been at rates of 14 percent, while the recovery may be taxed at 70 percent (a difference of 56 percent—four times the original "tax benefit"). Conversely, the situation may be reversed (the prior tax benefit may be worth four times the "recovery" in absolute dollar amounts). While these disparities focus on the inclusion side of the tax benefit rule, fortuitous disparities can also exist on the exclusion side, sometimes benefiting the taxpayer, sometimes the Government. See the ultimately unsuccessful attempt the Court of Claims made to deal with this problem in *Perry v. United States*, 142 Ct. Cl. 7, 160 F. Supp. 270 (1958), overruled in *Alice Phelan Sullivan Corp. v. United States*, 180 Ct. Cl. 659, 381 F.2d 399 (1967).

whether the stock of CBCC was a capital asset in the hands of petitioner.

Section 1221 defines the term "capital asset" as property held by the taxpayer, other than the five types of property enumerated therein.[14] It is well established, however, that in addition to the five statutory exclusions, other property may also be excluded from the definition of "capital asset." In *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), the Supreme Court held that corn futures' contracts, purchased and sold incident to the taxpayer's business operations, were not capital assets, stating:

> Nor can we find support for petitioner's contention that hedging is not within the exclusions of sec. 117(a). Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, *actual inventory*, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of sec. 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet v. Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by sec. 117 applies to transactions in property which are not the normal source of business income. * * * [350 U.S. at 51–52. Emphasis added.]

The Supreme Court noted that the corn futures were not *acutal* inventory, but it apparently felt they were the functional

---

[14]SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

 (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

 (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

 (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

 (A) a taxpayer whose personal efforts created such property,

 (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

 (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

 (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

 (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

equivalent thereto, yielding profits "from the everyday operation of a business," and should therefore be excluded from the definition of a capital asset.

The *Corn Products* doctrine has exhibited an omnidirectional resilience productive of an endless stream of litigation over essentially factual issues. The Court of Claims recently observed that *"Corn Products* has been applied in lower courts in a variety of situations which possibly might surprise the *Corn Products* court." *Agway, Inc. v. United States,* 207 Ct. Cl. 682, 524 F.2d 1194, 1200 (1975).[15] Thus in *Booth Newspapers, Inc. v. United States,* 157 Ct. Cl. 886, 303 F.2d 916 (1962), stock in a paper mill company was held not to be a capital asset in the hands of a publisher. The court stated:

if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code. [303 F.2d at 921].

However, in *Booth Newspapers, Inc.,* the taxpayer had hired a consulting engineering firm to recommend means to insure a supply of scarce newsprint. The consultant recommended the stock acquisition as the means to that end, and the court found that the taxpayers were motivated to acquire the stock *"solely* as a temporary expedient to insure an adequate inventory of newsprint during the period of shortage." (303 F.2d at 922. Emphasis added.)[16]

We recently noted in *W. W. Windle Co. v. Commissioner,* 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977), that there are no definitive precedents dealing with the acquisition of stock where both business and investment motives played a substantial role. That opinion traced the development of the doctrine as it applies to the facts

---

[15] "This approach simply turns 'property' from an all-inclusive term intó an elastic concept, contracting or expanding according to the courts' judgment of what a capital gain should be." S. Surrey, "Definitional Problems In Capital Gains Taxation," 69 Harv. L. Rev. 985, 996 (1956). While, as with the first issue, this is a two-way street, the toll in uncertainty and controversy, often including litigation expenses, is high.

[16] See also the discussion in *Booth Newspapers, Inc. v. United States,* 157 Ct. Cl. 886, 303 F.2d 916, 921 (1962) of *Electrical Fittings Corp. v. Commissioner,* 33 T.C. 1026, 1031 (1960) (*only* purpose to insure vital source of inventory), and *Journal Co. v. United States,* 195 F. Supp. 434 (E.D. Wis. 1961) (*no* intention of making investment).

before us. After an extensive analysis of the relevant cases, we held, in a court reviewed opinion without dissent, that "where a substantial investment motive exists in a predominantly business-motivated acquisition of corporate stock, such stock is a capital asset." 65 T.C. at 713. We emphasized two basic reasons for this holding:

In the first place, to expand the statutory exceptions to "capital assets" into a mixed-motive case will be greatly to enlarge the far more limited category of noncapital assets which would otherwise exist. We would thereby be even more greatly expanding the "gray area" of uncertainty and controversy. Taxpayers would be presented with enlarged opportunities to claim ordinary losses on unsuccessful investments and capital gains on successful ones. And they would be put to their proof by respondent with respect to their subjective intent upon claiming capital gains on disposition of a wide array of successful (albeit business-related) stock investments. For example, most investments in foreign subsidiaries, which usually have an important degree of business integration with their parents, would pass into the gray area. Where given a choice, we should rule on the side of predictability.

Secondly, in the last analysis, Congress has decided what is a capital asset, and there must be limits to the liberties we can take with the statutory language of section 1221. Words are not infinitely elastic. Giving full effect to the Supreme Court's admonition in *Corn Products* that the statutory exclusion from the definition of capital assets should be broadly construed, we nevertheless must read that in light of the close relation to inventory of the assets in question in that case.

As we move from inventory-related corn futures to a more traditional form of capital asset, such as stock, we should be more reluctant to be innovative in further broadening the domain of subjective analysis and unpredictability. * * * [65 T.C. at 713]

See also *Bell Fibre Products Corp. v. Commissioner*, T.C. Memo. 1977–42, appeal dismissed F.2d (7th Cir. 1977).

We believe that our holding in *W. W. Windle Co.* requires that we hold for petitioner on the issue before us. While it is clear that significant business motives impelled petitioner to acquire its stock in CBCC, it is equally clear that petitioner had a substantial investment motive as well.[17] As a field closely related to banking, the consumer credit business was a natural investment target for petitioner. Moreover, the explosive growth in consumer credit made CBCC a particularly attractive investment. The investment potential of CBCC in particular was

---

[17]The characterization of the acquired stock as a capital asset under *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977) cert. denied 431 U.S. 966 (1977), depends only on a *substantial* investment motive. Therefore, we need not determine whether the business or investment motive was predominant herein.

underscored by the substantial numbers of offers made for CBCC's stock, both before and after petitioner purchased its shares in CBCC. The sale of the CBCC stock at a substantial profit further suggests its investment value.

We recognize that the ownership of stock in CBCC provided CBCC with the capital to automate the Bureau's operation, assuring services that were very helpful to petitioner. But there were other alternatives for securing the financing considered by CBCC, and the correlative benefits or potentially improved services are also consistent with investment objectives. Additionally, petitioner's credit operations proceeded as usual even after the investment. Petitioner had access to CBCC's credit information before it owned stock in the corporation, and nonshareholder members of CBCC were given the same services at the same cost as shareholder members.

This case is, therefore, distinguishable from the garden variety of cases where stock in another corporation was purchased to assure a source of supply. See, e.g., *Western Wine & Liquor Co. v. Commissioner*, 18 T.C. 1090 (1952), appeal dismissed 205 F.2d 420 (8th Cir. 1953); *Electrical Fittings Corp. v. Commissioner*, 33 T.C. 1026 (1960); *Booth Newspapers, Inc. v. United States, supra.* Even after petitioner's acquisition of CBCC stock, petitioner's procedures for gathering credit remained about the same, with no special emphasis on the use of CBCC as a source of credit.[18]

Respondent contends that there were no investment motives underlying the acquisition, noting that dividends were not paid, and that price was not really a factor in either the acquisition of the stock by the petitioner or the later sale of CBCC to Union Tank Car Co. However, when the acquisition was under consideration by petitioner, an extensive exploratory memorandum was prepared for Mr. J. H. Perkins, then senior vice president, who apparently had the final authority to decide whether to acquire the CBCC stock and on what terms. The memorandum stated:

Continental and First have made repeated overtures to the principals of Credit Bureau of Cook County (CBCC) for an opportunity to purchase a meaningful

---

[18]This case is also clearly distinguishable from *John J. Grier Co. v. United States*, 328 F.2d 163 (7th Cir. 1964), discussed by the parties. In *Grier* the court found that the taxpayer negotiated for the purchase of a restaurant and operated a restaurant business. Only after the negotiations were completed was it learned that the stock would have to be acquired to preserve an existing lease.

percentage of the Bureau's stock. Each of us is now being offered 17.5 %, total 35%, for $750,000 each, total $1,500,00.

These overtures were made originally in late 1965 and early 1966 before our charge card feasibility study; *they were solely the result of our recognizing the tremendous profit potential and power of a credit bureau resulting from expanding consumer credit.* No serious or intelligent thought was given to the valuation of a bureau—the cost of our acquiring a meaningful percentage of ownership—we were simply exploring. [Emphasis added.]

There is nothing to indicate that this investment motive did not continue to play a substantial role in 1967. In fact, while the business motives relating to the entry into the charge card market also played a major role, this memo clearly demonstrates that investment motives were important. Thus, while the memo goes on to suggest several different prices that might be offered (the higher ones being justified on the basis of fairness and the needs of the credit bureau that would subserve petitioner's business), the offer made and the price paid was $550 per share, very close to the lowest figure under consideration.[19]

Additionally, when the decision was made to sell stock to the banks, Ernst & Ernst was employed "to study CBCC, to project its cash needs for automation, prepare five years cash flow, and determine valuation." Also, there is absolutely no evidence that a premium was paid reflecting any advantages ownership of the 17.5 percent might provide for petitioner's existing business. Cf. *Dearborn Co. v. United States*, 195 Ct. Cl. 219, 444 F.2d 1145, 1167 (1971).

While the business factors were significant in selecting the purchaser of CBCC when sold, it is clear from the record that price and the ability to come up with the money were also significant factors. Finally, the fact that earnings were being reinvested to capitalize on growth opportunities rather than distributed as a dividend does not negate investment objectives.

At bottom, respondent predicates his case on restrictions the banking laws impose on the kind of investments petitioner may make. In this respect, the parties have focused our attention on paragraph 7480 or the Comptroller's Manual for National Banks, providing:

National banks, as a necessary business expense, may make reasonable contributions to local community agencies and groups to further the physical,

---

[19]The author of the exploratory paper considered figures between $540 and $840 per share, coming down on the side of the higher figure.

economic, and social development of their communities. Such contributions may take the form of an investment in a corporation organized to carry on such activities, but the aggregate investment in such corporations may not exceed 2% of the bank's capital and surplus.

This language specifically permits "investment in a corporation" that is organized to "further the physical, economic, and social development" of the communities wherein the bank does business (up to 2 percent of the bank's capital and surplus). It is clear that petitioner intended to make money on this "investment" and did make money. Certainly if a bank buys stock in a corporation organized to develop ports and harbors in the city, to build and operate a civic center, or to finance senior citizen housing, any gain realized will be a capital gain. Respondent would surely object to an ordinary loss claimed solely on the basis of the Comptroller's manual, without regard to all the other facts and circumstances of the case. Cf. *Booth Newspapers, Inc. v. United States*, 157 Ct. Cl. 886, 303 F.2d 916, 921 (1962).

We think the situation no different here. The fact that the Comptroller, in his evaluation of the banking statutes, has ruled that a company like CBCC was an appropriate business for petitioner to invest in, does not mean we must ignore all of the other facts and circumstances that, as we have found, clearly demonstrate petitioner had a substantial investment motive.[20]

In sum, while we acknowledge the importance of business considerations in the CBCC stock purchases, we are also convinced that that investment played a very substantial part in the motivation for acquiring the stock.

*Decision will be entered under Rule 155.*

---

[20]The Comptroller also required petitioner to immediately write off the investment for book purposes. Respondent would certainly object to any attempt to write the investment off for tax purposes, and properly so. While the banking laws may color the transaction before us, they are only one of the facts and circumstances to consider.